Argued April 13, reversed and remanded with directions May 2, petition for rehearing denied May 29, 1962

## STATE OF OREGON v. GRADY

371 P. 2d 68

*James L. Hershner,* Eugene, argued the cause and filed briefs for appellant.

*Joseph J. Brown,* Deputy District Attorney, Eugene, argued the cause for respondent. With him on the brief was William F. Frye, District Attorney, Eugene.

Before McALLISTER, Chief Justice, and WARNER, SLOAN and GOODWIN, Justices.

WARNER, J.

This is a proceeding instituted under ORS 419.525 in the Circuit Court for Lane County, Juvenile Department, at the instance of the Welfare Commission of that county. It seeks to terminate the parental rights of the defendant in her youngest child. From an order permanently terminating such rights, the defendant mother appeals.

At the time of the hearing (August 25, 1961) the defendant was 20 years old. She is the mother of three young daughters. The youngest is the subject of this proceeding and was 10 months old at that time.

The defendant's life since she first left home at the age of 15 with her mother's consent has been crowded with heartache and tragedy, much of it of her own madcap making. In that relatively short time she has been in the custody of juvenile authorities, borne three little girls, two out of wedlock; and been married once, in February, 1958. It was a union which lasted less than two years. Shortly after her divorce, she was convicted of forgery (July 15, 1960) and sentenced to a term of five years, but released on probation. At that time she was carrying the subject child who was born on October 19, 1960. On December 2, 1960, she was taken into custody for violating the conditions of her probation. It appears from the record that she will be considered for parole sometime in June of this year.

We do not condone her conduct, but we do not close our eyes to testimony revealing, as a partial explanation for its pattern, the fact that, when 11 years old, her parents were divorced. Until she left home, she lived with her mother, two younger and two older sisters, and stepfather. In her meanderings from home

and various foster homes, she went to her father, in Lane county, but he declined to let her live with him. Her mother described her as a person who felt "left out" of the family and as one unloved.

The question presented by this appeal is whether the petitioner has established by a preponderance of competent evidence that defendant was unfit to continue the parental relationship by reason of conduct or conditions which were seriously detrimental to the child as required by ORS 419.525(2).

. Before parental rights can be terminated without the consent of the parent, the juvenile court must find (a) that the parent or parents are unfit by reason of conduct or conditions seriously detrimental to the child; or (b) that they have abandoned the child. ORS 419.523(2).

The rights of parents are not necessarily terminated as a matter of law because of a parent's incarceration in a penal institution. Indeed, Mr. Viegas, a child welfare worker for the Lane County Juvenile Court and Welfare Commission, and the person who signed the petition for and in behalf of the latter organization, testified that in his opinion he did not believe such a confinement was of itself sufficient to justify a cessation of a parent's rights to a child.

We know that an incarceration does not legally effectuate a parental abandonment of a child so as to waive the necessity for a consent to a proposed adoption. Welker's Adoption, 50 Pa D & C 573 (1944); Annotation, 35 ALR2d 662, 693. Nor do we think that such an enforced separation of the parent from a child warrants an inference that the convicted parent, especially a mother of a child of tender age, has suffered any diminution of her natural maternal in-

stincts or desires to resume the custody and care of such infant after her release. The evidence here strengthens our conviction in the righteousness of that conclusion. It shows her continuing interest and inquiry by correspondence in the welfare of her two older daughters, who at the time of the hearing were in the care of defendant's mother. It speaks of her fruitless efforts to locate through the officers of the Welfare Commission the whereabouts of the youngest child. We deem it of no little significance and a display of the depth of her maternal regard that, notwithstanding her penal situation, she elected to contest the effort to take the child away from her forever, and failing in the trial court, initiated this appeal.

In *Shrout v. Shrout,* 224 Or 521, 525, 356 P2d 935 (1960), we affirmed the rule "that not every act of indiscretion or immorality should deprive a mother of the custody of her children." See, also, *State v. Easley,* 228 Or 472, 365 P2d 293, 294 (1961).

It is no slight thing to permanently deprive a parent of the care, custody and society of a child, or a child of the protection, guidance and affection of a parent, notwithstanding that the parent has erred in the past, and especially when there is yet a possibility that the parent may later demonstrate a rehabilitation by sufficient conduct and character in accord with the accepted standards and duties of motherhood.

The evidence presented is sufficient to warrant an order committing the child to the temporary custody of the Welfare Commission. But the circumstances which justify such an order are not, in our opinion, sufficient to justify at this time a complete severance of all maternal rights in defendant's youngest child. As we have pointed out above, there is evidence which justifies hope that the defendant mother may later be

able to adequately resume her maternal duties to this very young little girl. See *In Re Miller*, 40 Wash2d 319, 242 P2d 1016, 1019 (1952); *In Re Sickles*, 42 Wash2d 17, 252 P2d 1063, 1065 (1953). Nor can we conclude from the record that the conduct of the child's mother shows any departure from her maternal responsibilities toward the child such as to warrant a permanent cessation of the parental relationship. Nor do we find in the mother's social conduct, considering her age and the divorce of her parents in her early years, any showing of inherent traits of character that can not be corrected. Indeed, aside from the defendant's own representations that her penal confinement has had a maturing effect and awakened in her a consciousness of her responsibilities, there are other indicia in the record to inspire hope for a return to a life of maternal normalcy and correct living.

We think that the evidence does not preponderate to support the trial court's finding that the defendant is unfit by reason of conduct and condition seriously detrimental to the subject child. In so saying, we do not ignore the significance of her present penal confinement. At most it dictates the continuity of some custodial arrangement during the mother's confinement and for a reasonable period thereafter to and until the defendant has had an opportunity to reestablish herself and demonstrate to the court assurances of her stability, reliability and competence to properly care for her baby.

In reaching our conclusion we are mindful of that salutary provision of the Oregon Constitution which declares: "Laws for the punishment of crime shall be founded on the principles of reformation, and not of vindictive justice." (Art I, § 15) The defendant's testimony manifests a reformed viewpoint induced by her

present servitude. It also manifests a deep and continuing interest in her children and a desire to bring them under one rooftree. What better inducement can she have for redemption than the assurance that she may have again her little girls in one united family? What a devastating blow to self-improvement if this young person, who, according to her own mother, yearned for affection and felt left out in her own family, to learn that she is to be forever separated from her little ones after satisfying the penalty of imprisonment. To destroy the great human tie between her and those she bore would, under the circumstances present here, approximate a species of unintended vindictive justice which might well undo all of the reformation expected from her present incarceration. On the other hand, the very remission of the order of permanent custody may create a challenge and encourage her in her striving to attain a new and better way of life, and we hope that it will.

The order of the court will be vacated and an order entered continuing the custody of the child in the Welfare Commission to and until the defendant is released from the penitentiary and thereafter until she demonstrates to the court that she has been rehabilitated and is competent to care for the child in a manner not detrimental to its welfare.