Argued April 5, reversed June 23, 1971

IN THE MATTER OF ANNA CHRISTINE McMASTER,
A MINOR CHILD

STATE OF OREGON, *Respondent, v.*
McMASTER ET UX, *Petitioners.*
486 P2d 567

*Douglas S. Green,* Portland, argued the cause for petitioners. With him on the briefs was Legal Aid Service, Portland.

*Elizabeth Preston,* Deputy District Attorney, Portland, argued the cause for respondent. With her on the brief was George Van Hoomissen, District Attorney, Portland.

Before McAllister, Presiding Justice, and DENECKE, HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

DENECKE, J.

This is a proceeding to terminate parental rights in a four-year-old child under ORS 419.523 (2) (a), which provides for such termination if parents are found to be "unfit by reason of conduct or condition seriously detrimental to the child." The parents have petitioned for review of a decision by the Court of Appeals which affirmed an order terminating their parental rights in the child and authorized the Oregon State Public Welfare Commission to place the child for adoption without consent of the parents. 4 Or App 112, 476 P2d 814 (1970).

Two questions are presented for decision:

(1) Whether the trial court erred in overruling a demurrer to the petition to terminate parental rights upon the ground that ORS 419.523 (2)(a) is unconstitutional as a violation of due process of law under the Fifth and Fourteenth Amendments of the Constitution of the United States and Art I, § 10, of the Oregon Constitution "in that said statute is unconstitutionally broad, uncertain and vague," and

(2) Whether the evidence was "sufficient to hold that defendants were 'unfit by reason of conduct or conditions seriously detrimental to the child'."

Because of the importance of the first of these questions, we granted the petition for review.

The facts of this case illustrate one of the serious social problems of our times. This child, four

years of age at the time of trial, was born out of wedlock. The parents were subsequently married. When two months of age she was taken from her mother and placed in emergency custody. She was placed with foster parents, where she has remained. She was found to be within the jurisdiction of the juvenile court. The petition for termination of parental rights was filed pursuant to the order of the juvenile court.

In determining the constitutional issue a review of the entire procedure in a case such as this may be helpful in having the proper perspective.

1. In order for parental rights to be terminated under ORS 419.523 the child must be within the jurisdiction of the juvenile court. Jurisdiction is fixed by ORS 419.476 (1), which provides:

"The juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and:

"(a) Who has committed an act which is a violation, or which if done by an adult would constitute a violation, of a law or ordinance of the United States or a state, county or city; or

"(b) Who is beyond the control of his parents, guardian or other person having his custody; or

"(c) Whose behavior, condition or circumstances are such as to endanger his own welfare or the welfare of others; or

"(d) Who is dependent for care and support on a public or private child-caring agency that needs the services of the court in planning for his best interests; or

"(e) Either his parents or any other person having his custody have abandoned him, failed to provide him with the support or education required by law, subjected him to cruelty or depravity or

failed to provide him with the care, guidance and protection necessary for his physical, mental or emotional well-being; or

"(f) Who has run away from his home."

2. Once a child is within the jurisdiction of the juvenile court, the court may take the child from the legal custody of the parents and place the custody of the child with other persons or an institution. ORS 419.507. Such a change in custody can be for the remainder of the child's minority.

ORS 419.523 provides:

"(1) The parental rights of the parents of a child within the jurisdiction of the juvenile court as provided in subsection (1) of ORS 419.476 may be terminated as provided in this section and ORS 419.525. The rights of one parent may be terminated without affecting the rights of the other parent.

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents:

"(a) Are unfit by reason of conduct or condition seriously detrimental to the child; or

"(b) Have wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year. In determining whether the parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child, the court may disregard incidental visitations, communications and contributions."

This is not a criminal procedure such as *State v. Hodges,* 254 Or 21, 457 P2d 491 (1969). Admittedly, a serious interest of the parents is in issue which can be assumed to be as important to the parents as their freedom, which is in jeopardy in a criminal proceeding.

It is also not a regulatory proceeding in which the state is pitted against an individual. The statute is not one which forbids or requires the doing of an act. *Connally v. General Const. Co.,* 269 US 385, 391, 46 S Ct 126, 70 L Ed 322 (1926). An example of what a regulatory proceeding is is *Morrison v. State Board of Education,* 1 Cal3d 214, 82 Cal Rptr 175, 461 P2d 375, 387 (1969). That decision involved an appeal from a decision of the Board of Education revoking a license to teach for violation of the Education Code. The court held the Education Code had to satisfy the same requirements for specificity as did criminal laws.

3, 4. The procedure here is not the state against the parents. Three parties are involved: the state, the parents and the child. The welfare of the child is the primary consideration of the Juvenile Code of 1959. ORS 419.474. That the welfare of the child is the primary purpose does not lead to the conclusion that the rights of the parents are without constitutional protections. *State v. Jamison,* 251 Or 114, 444 P2d 15, 444 P2d 1005 (1968). This emphasis upon the welfare of the child does imply, however, that, unlike criminal statutes in which the interests of only one set of individuals is involved, the constitutional issue must be examined with the interests of both the child and the parents. What might be unconstitutional if only the parents' rights were involved is constitutional if the statute adopts legitimate and necessary means to protect the child's interests. In our opinion it does.

It is significant that the statute we are testing is in the juvenile code and not the criminal code or some other portion of our laws. While the juvenile code is administered by courts, the code directs the juvenile courts to act in some manners similar to a social administrative agency. Much of the code and

much of the juvenile court's budget is devoted to the proper disposition of the child after the child comes within the court's jurisdiction. To adequately perform this function the legislature reasonably deemed it desirable to give the juvenile court greater flexibility than may be thought desirable for a court functioning in its criminal role.

The flexibility granted the juvenile court by the legislature is epitomized by the general charge made in ORS 419.474 (2):

"The provisions of ORS 419.472 to 419.587 shall be liberally construed to the end that the child coming within the jurisdiction of the court may receive such care, guidance and control, preferably in his own home, as will lead to the child's welfare and the best interests of the public, and that when a child is removed from the control of his parents the court may secure for him care that best meets the needs of the child."

We are not shocked by a grant of flexibility to administrative agencies dealing with our material affairs such as businesses and professions. For example, a common carrier can receive or be denied a certificate to operate, depending upon whether or not the Public Utility Commissioner finds the service proposed "is or will be required by the present or future public convenience and necessity." ORS 767.135 (4)(c). Admission to the bar is conditioned upon having "the requisite learning and ability" as shown by an examination. ORS 9.220 (3). There is no reason why the welfare of the children of the state should be relegated to a system of rigid rules and standards.

The United States Supreme Court has held that in the states' juvenile procedures at the adjudicatory stage, the states cannot ignore some of the procedural

due process requirements. That Court, however, has not held that all the substantive due process requirements of the criminal law were applicable to juvenile proceedings, particularly the dispositional process of juvenile proceedings. It has indicated to the contrary. *In Re Winship,* 397 US 358, 90 S Ct 1068, 25 L Ed2d 368 (1970), the Court held that the Due Process Clause required that a juvenile could be found to be "delinquent" only by evidence convincing beyond a reasonable doubt. The Court, however, pointed out that under its decision, "the opportunity during the postadjudicatory or dispositional hearing for a wideranging view of the child's social history and for his individualized treatment will remain unimpaired." 397 US at 366.

Even in cases involving criminal statutes an important consideration is whether the statute is as explicit as the legislature can draw and accomplish the purpose it intends. *United States v. Petrillo,* 332 US 1, 67 S Ct 1538, 91 L Ed 1877, 1882 (1946); 62 Harv L Rev 76, 82-83 (1948). Mr. Justice Frankfurter, dissenting in *Winters v. New York,* 333 US 507, 524-525, 68 S Ct 665, 92 L Ed 840 (1948), commented:

> "* * * But whether notice is or is not 'fair' depends upon the subject matter to which it relates. Unlike the abstract stuff of mathematics, or the quantitatively ascertainable elements of much of natural science, legislation is greatly concerned with the multiform psychological complexities of individual and social conduct. Accordingly, the demands upon legislation, and its responses, are variable and multiform. * * *"

In our opinion, to accomplish its primary purpose of caring for the welfare of the child, the legislature would have extreme difficulty being more

specific. The legislature could specify certain conduct upon the part of the parents which would cause them to be deprived of their parental rights; however, that is not the intent of the legislature or of this court in interpreting this statute. The legislature and this court do not desire to sever parental rights for any conduct by the parents unless such conduct seriously affects the child's welfare. For example, imprisonment was not held conduct "seriously detrimental to the child," in *State v. Grady,* 231 Or 65, 371 P2d 68 (1962); wilful fraud upon the court likewise was held not sufficient to sever parental rights. *Cutts v. Cutts,* 229 Or 33, 43, 366 P2d 179 (1961).

The legislature could "spell out" what aspects of the child's well-being harmed by the parents' conduct were grounds for severing parental rights as the Missouri statute does in specifying "health, morals, or well-being." Missouri Revised Statutes 211.441. This does not add anything, however. Because the Oregon statute does not specify, the inference is that it is conduct detrimental to any major aspect of the child. This is undoubtedly what the legislature intended.

That we are not concerned with the criminal statute also makes inapplicable one of the bases for *State v. Hodges,* supra (254 Or at 27), that is, "the terms of a penal statute creating an offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." We would hope that in the case of the McMasters, or any parents, there is no need for an explicit statute to "spell out" how poorly they can treat their child before risking loss of their parental rights.

If some notice of conduct which will cause a

result is required in a noncriminal statute, the parental rights statute gives adequate notice of the kind of conduct involved and the result which will occur. The conduct is of a kind detrimental to the child, not beneficial. It is not just any detrimental conduct but seriously detrimental conduct. We see no policy to be furthered by attempting to elaborate on what conduct is seriously detrimental and what is not. The ordinary parent should "get the message" from the statute as it is now worded.

5, 6. The other basis for *State v. Hodges, supra* (254 Or 21), is labeled "adjudication"; a statute must be certain enough so that a court or jury does not have uncontrolled discretion to act or withhold action. The history of the parental rights statute reveals that the juvenile court does not have unbridled discretion under that law. As this court and the Court of Appeals have held, under that statute, the juvenile court does not have uncontrolled discretion to terminate or not terminate parental rights. Only when the parents' conduct is seriously detrimental to the child can parental rights be terminated. As stated, in *State v. Grady,* supra (231 Or 65), we held that imprisonment on a felony charge and the mother's commitment of a felony and of later acts causing her probation to be revoked was not sufficient to support the trial court's finding that such conduct and condition were seriously detrimental to the child.

In *State v. Easley (Hull),* 228 Or 472, 473, 365 P2d 293 (1961), "possibly untrue answers given by defendant [mother] in her testimony" was an insufficient ground to support the juvenile court's termination of parental rights upon the ground that such conduct was seriously detrimental to the child.

"Even if it were true that Stanford Cutts [the father] wilfully worked a fraud upon the court, which has not been demonstrated, we do not believe such collateral misconduct is sufficient ground to constitute the kind of depravity required to invoke the provisions of ORS 419.523." *Cutts v. Cutts,* supra (229 Or at 43).

On the other hand, in *State v. Blum,* 1 Or App 409, 463 P2d 367 (1970), the Court of Appeals found the parent's condition was seriously detrimental to the child and affirmed the termination of parental rights. The uncontradicted evidence was that the mother had a recurring mental illness and that the prognosis was that she never would be able to care for her child and that the mother's mental condition and the incapability accompanying such mental condition made her condition seriously detrimental to the child.

7. For these reasons we are of the opinion that the statute is not constitutionally vague.

8. We are further of the opinion, however, that the evidence does not support the juvenile court's finding that the conduct of the parents has been seriously detrimental to the child within the meaning of ORS 419.523 (2)(a).

The child was born in June 1965. About two months later the child was taken from her mother and placed in emergency custody. This was done under a warrant issued pursuant to an affidavit stating that the Women's Protective Division (WPD) received complaint that the child was not receiving proper care and other allegations. The child was subsequently placed with a foster couple and in April 1966 made a ward of the juvenile court. The foster parents, who

have had the child since some time before April 1966, desire to adopt the child and Mrs. McMaster refuses to consent.

The essence of the case against the McMasters is stated in the following testimony by a representative of the Multnomah County Welfare Department:

"The original removal [emergency custody] would have been based on conditions in the home and the neglect of the child; but subsequently to that the primary problems have been the mutual instability of the parents, probably paramount, and numerous separations and lack of concern and consistency that they might have for anyone else that might be living in the home, the family's management. At times there has been adequate money. At times there has been money, not from the assistance grant, of sufficient nature to manage and it has not been managed properly; and also frequent moving because they have lived in many places during the past four years."

This testimony was elaborated upon by evidence that the parents frequently quarreled, McMaster never held a job more than a month and seldom that long, they were usually on welfare, and McMaster frequently left home with the welfare check, leaving Mrs. McMaster destitute. They were unable, particularly Mr. McMaster, to handle their financial affairs. The caseworker testified that the foster parents were the complete antithesis,—stable, consistent and mutually supportive.

There was testimony which was uncontradicted that if the child were now taken from the foster parents and placed with her natural parents it would have a serious detrimental effect upon the child. This same testimony developed, however, that this is primarily because the child has lived with foster parents for

almost all of her now almost six years. The detrimental effect on the child is not necessarily because of the conduct of her natural parents, except that the child may resent being taken from the better all-around environment provided by her foster parents as compared to that which would be provided by her natural parents.

9. However, a decision in favor of the natural parents in this termination proceeding does not result in the child being transferred to the custody of her natural parents. We are only deciding that the McMaster's parental rights cannot be terminated at this time. The juvenile court must determine whether custody should remain with the foster parents. If it does, we realize that the foster parents may be kept in a state of anxiety never knowing when the child might be taken from their custody. Nevertheless, we are of the opinion that the natural parents' rights cannot now be terminated.

We are of the opinion that the state of the McMaster family is duplicated in hundred of thousands of American families,—transiency and incapacity, poverty and instability. The witness was undoubtedly correct when he stated that living in the McMasters' household would not "allow this child to maximize her potential." However, we do not believe the legislature contemplated that parental rights could be terminated because the natural parents are unable to furnish surroundings which would enable the child to grow up as we would desire all children to do. When the legislature used the phrase, "seriously detrimental to the child," we believe that they had in mind a more serious and uncommon detriment than that caused by the conduct of parents such as the McMasters. The best interests of the child are paramount; however, the

courts cannot sever the McMasters' parental rights when many thousands of children are being raised under basically the same circumstances as this child. The legislature had in mind conduct substantially departing from the norm and unfortunately for our children the McMaster's conduct is not such a departure.

Reversed.

TONGUE, J., concurring.

I concur in the result of the majority opinion that the rights of the parents should not be severed in the child involved in this case. I do not agree, however, with the reasoning by the majority and, in particular, in the holding that ORS 419.523 (2)(a) is a valid and constitutional statute.

I agree that the facts of this case, as reviewed by the majority, illustrate one of the serious social problems of our times. Indeed, this is a particularly tragic case and one calling for the wisdom of a twentieth century Solomon. Perhaps that ancient decree would persuade this mother to yield to the best interests of her child, regardless of constitutional considerations of "due process." Otherwise, the emotional and mental health of this child may well be maimed as surely as if by that proverbial sword.

The courts, however, do not profess to possess either such wisdom or such power. Nevertheless, in deciding cases involving such problems, the courts must act within the framework and limitations of the constitution and laws of this state and nation.

With all due respect to the majority, however, it is my view that the limitations imposed upon the state by the constitutions of the United States and the

State of Oregon, as previously construed by the Supreme Court of the United States and also by this court, are not satisfied by the provisions of ORS 419.523 (2)(a) and require a holding that this statute is constitutionally invalid for vagueness and indefiniteness.

To understand this subject, as a part of what is now called "family law," it is first necessary to consider its history and development in this state. In 1888 the law of Oregon on this subject was first stated in *Furgeson v. Jones,* 17 Or 204 (involving the validity of an adoption proceeding), at p 217:

> "The permanent transfer of the natural rights of a parent was against the policy of the common law. The right of adoption, as conferred by this statute, was unknown to it, and repugnant to its principles. * * * The right of adoption, then being in derogation of common law, is a special power conferred by statute, and the rule is, that such statutes must be strictly construed. * * * This being so, the statute must receive a strict interpretation, and every requirement essential to authorize the court to exercise the special power conferred must be strictly complied with."

Nearly 50 years later, still in accord with this view, the court in *In re Schein,* 156 Or 661, 69 P2d 293 (1937), reversed a jury verdict and judgment declaring Helen Schein to be a "dependent child" and taking her from the custody of her father, holding (at pp 667-68):

> "It never was the intention of the legislature to take a child away from its parent because the parent was financially unable to provide a home with all the modern appliances and appurtenances that would be found in the ordinary city home. * * *
>
> "The legislature never intended that a parent who enforces proper discipline in the home and

gives his child the proper moral training, furnishes sufficient food, clothing and shelter for it, should be deprived of the custody and control of such child just because someone in better circumstances financially would be able to give that child what society might consider greater advantages than it would receive in its humble home. * * *."

Twenty-four years later, in *Simons v. Smith,* 229 Or 277, 366 P2d 875 (1961), this court also reversed a decree granting a petition to adopt children without the consent of the parents and terminating their parental rights, holding (at p 278):

"As a general proposition, the law protects the natural rights of parents."

and later (at p 280):

"The reason for terminating parental rights ought to be related to the parent's conduct as a parent. In their most palatable form, discretionary statutes require the trial judge to consider 'the best interests of the child.' Courts which base their decisions on 'the best interests of the child' use that term as a term of art borrowed from divorce jurisprudence. Cf. cases collected in Annotation, 47 ALR2d 824. This rationale is unacceptable for several reasons."

The primary reason for recognizing the distinction between the concept of "the best interests of the child," as applied in divorce litigation and as applied in proceedings to terminate all parental rights in a child by placing it for adoption without consent by the parents, was stated (at p 281):

"The best-interests-of-the-child standard has no similar relation to the issues presented in a proceeding to dispense with consent for an adoption. In an adoption, a court is asked to terminate every right and interest of the natural parent. Adoption goes far beyond the child-centered question of cus-

tody during minority. Indeed, the denial of an adoption petition has no necessary bearing on the physical custody of the child. The child's environment can be protected in a number of ways, under the divorce laws and the juvenile code. The petition to adopt concerns a different kind of right, the subjective tie between a parent and child, the right of a parent to be identified with his child for emotional, religious or other reasons. A father may hope his son will bear his name; a mother may anticipate that her daughter will inherit her property. On the other hand, there is ordinarily no vital interest of the child which requires the termination of his parents' rights. * * *."

and, further (at p 285):

"Because of the differences between the issues involved in divorce cases and those involved in petitions of adoption, we hold that the *reasons for terminating parental rights must be related to an objective standard required of all parents rather than to the child-oriented evaluation of competing home environments employed in divorce suits*." (Emphasis added)

Finally, this court said in *Simons v. Smith* (at p 287):

"In general, statutes which dispense with the consent of the natural parent require a pleading and proof of moral fault, the degree of which may vary from state to state and from statute to statute. *Running through such statutory schemes is the idea that the parent to be forever alienated from his child must have demonstrated either an intent to abandon the child or such moral depravity as to amount to the equivalent of an abandonment*." (Emphasis added)

That decision, however, went no further than to hold that the parents must be given proper notice of such proceedings. Thus, the court did not pass upon

the validity of ORS 419.523. It is nevertheless to be noted that this court in that case was of the view that "the best interest of the child" rationale, as applied in custody proceedings, was not appropriate in a proceeding to terminate parental rights and that only extreme parental misconduct based upon an "objective standard," would justify a termination of such rights under ORS 419.523.

To much the same effect, in *State v. Grady,* 231 Or 65, 371 P2d 68 (1962), this court reversed an order permanently terminating the parental rights of a mother, despite evidence of gross immorality and conviction for forgery, holding (at p 68):

> "It is no slight thing to permanently deprive a parent of the care, custody and society of a child, or a child of the protection, guidance and affection of a parent, notwithstanding that the parent has erred in the past, and especially when there is yet a possibility that the parent may later demonstrate a rehabilitation by sufficient conduct and character in accord with the accepted standards and duties of motherhood."

*But see* Larsen, Trends in Oregon Family Law, 43 Or L Rev 193, at 208 (1964), criticizing that decision.

Meanwhile the statutes on this subject had undergone drastic revision as a result of the 1959 "Report of the Legislature Interim Committee on Judicial Administration," as established in 1957, including Part II, on "Family Law." One of the recommendations of that report was that:

> "1.  The laws establishing and defining the powers of the juvenile court and prescribing its procedures should be completely rewritten to remedy the following deficiencies:
>
> "(a)  Uncertain and outmoded definitions.

"(b) Vagueness or silence in important procedural matters * * *."

In the text of the report in support of that recommendation was stated (at pp 22-3) that:

"Sections 26 and 27 deal with termination of the rights of the child's parents. * * *

"The dereliction may be actions or lack of actions which work serious harm to the child. See paragraph (a) of section 26 (2). The dereliction may be simply the abandonment of the child. In this respect, the proposed bill makes important changes from present law. * * *

"* * *

"These provisions [relating to abandonment] are perhaps more exacting than present law. In the committee's judgment, however, present law represents altogether too great an emphasis on the rights of the parent and too little emphasis on the duties of the parent and the interests of the child. A child may still be treated as a chattel for some purposes, but this should not be one of them."

Based upon this report, a new Juvenile Code was adopted in 1959. By ORS 419.474 it is expressly recognized that the welfare of the child is the primary purpose of that statute and by ORS 419.474 it is provided that the statute shall be liberally construed. Also included in the statute is ORS 419.523, which now provides as follows:

"Termination of parental rights; grounds.

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents:

"(a) Are *unfit by reason of conduct or condition seriously detrimental to the child*; or

"(b) Have wilfully deserted or neglected without just and sufficient cause to provide proper care

and maintenance for the child for one year. In determining whether the parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child, the court may disregard incidental visitations, communications and contributions." (Emphasis added)

Upon reading this section it will be noted that although the provisions of subsection (2)(b), relating to abandonment, have been made more specific than previous statutory provisions,[1] the provisions of subsection (2)(a) were made less specific than previous statutory provisions.[2] Thus, this subsection of the statute is hardly in accord with the stated purpose of the Juvenile Code Revision to remedy "uncertain" definitions and to eliminate "vagueness" in "important procedural matters."[3]

Seven years later, in *State v. Winters*, 243 Or

---

[1] ORS 419.523 (b), relating to abandonment, was later amended by Oregon Laws 1963, ch 152, § 1, but subsection (a) was not amended at that time.

[2] Prior to 1959 parental rights could be permanently terminated under ORS 419.526 for conduct detrimental to the child (other than abandonment) only upon a finding of "child dependency," which was defined in ORS 419.102.

[3] In an article entitled, "Oregon's New Juvenile Code," 39 Or L Rev 305 (1960), at pp 311 to 312, the Hon. Ralph M. Holman, now a member of this court, discussed some of the problems of terminating such rights without parental consent to adoption after personal service of process on the parents and the hardship to the taxpayer of a large number of abandoned children on the welfare rolls and in foster homes. Without specific discussion of the provisions of ORS 419.523 (a), he concluded his discussion on this general subject by saying:

"It was the feeling of the committee that a child would never have an opportunity to be completely integrated in another family as long as any legal relationship, privileges, or responsibilities whatsoever remained with respect to his real parents. Thus, the child's emotional well-being and his resultant relationship to society in truth require not only a permanent severance of custodial rights but of all rights."

313, 413 P2d 425 (1966), this court affirmed an order terminating the parental rights of a child under ORS 419.523, but did so based upon a finding that the child's mother was not only guilty of gross immorality, but "for more than one year *wilfully* failed, refused and neglected her children without sufficient cause." (See p 316) No issue was raised relating to the constitutional validity of ORS 419.523.

However, in *State v. Jamison,* 251 Or 114, 444 P2d 15, 444 P2d 1005 (1968), it was contended in a proceeding under ORS 419.523 to terminate parental rights, that the mother of the children involved had a constitutional right to the assistance of counsel. In sustaining that contention, this court (without deciding whether due process requires appointment of counsel in other types of juvenile proceedings), restated its previous position in holding (at p 117):

> "The permanent termination of parental rights is one of the most drastic actions the state can take against its inhabitants. It would be unconscionable for the state forever to terminate the parental rights of the poor without allowing such parents to be assisted by counsel."

and (at p 118):

> "While the case at bar is not a criminal matter, the consequences of the denial of counsel are as serious as they are in most criminal prosecutions."

Again, no contention was made that ORS 419.523 was constitutionally invalid for vagueness or indefiniteness.

That question was, however, recently presented to this court for consideration, although under another statute, in *State v. Hodges,* 254 Or 21, 457 P2d 491 (1969). In that case defendant appealed from a con-

viction of violating ORS 167.210 (contributing to the delinquency of a minor). That statute provided for the fine or imprisonment of:

"* * * any person who does any act which manifestly tends to cause any child to become a delinquent child."

Under ORS 419.216 (c), a "delinquent child" was defined as including a child "whose behavior, condition or circumstances are such as to endanger his own welfare or the welfare of others; * * *."

In determining the constitutional validity of ORS 167.210 this court adopted and approved the following test, as stated by the Supreme Court of the United States in *Giaccio v. Pennsylvania,* 382 US 399, 402, 86 S Ct 518, 15 L ed 2d 447 (1966):

"It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case."

The reason for such a rule (as stated on p 27), is that:

"In addition to its due-process function of putting persons on notice of the law's demands, reasonable certainty serves a second purpose: adjudication. A law that permits the judge and jury to punish or withhold punishment in their uncontrolled discretion is defective as much for its uncertainty of adjudication as for its failure to notify potential defendants of its scope and reach."

Applying these rules to ORS 167.210, this court held that it was unconstitutional because of its vagueness, saying (at p 28):

"Such a statute not only creates a serious danger

of inequality in the administration of the criminal law, but it runs squarely contrary to the purpose of Oregon Constitution, Art I, § 21, which prohibits the delegation of legislative power.

"The very looseness of the language of ORS 167.210 encourages the prosecution to utilize the statute selectively to rid the community of individuals deemed subjectively less desirable than other offenders. It is the looseness of the language which offends due process and makes the catch-all clause of the statute an instrument of potential abuse."

On application of this same test to the provisions of ORS 419.523 (2)(a), I am of the opinion that the same result must follow. I agree with the Court of Appeals that it is our duty to attempt, if possible, to construe the statute in such a manner that its constitutionality can be sustained. In my opinion, however, it is not reasonably possible to so construe this statute.[4]

---

[4] It was also held by the Court of Appeals, 4 Or App 112, 476 P2d 814 (1970), that where ORS 419.523 (2)(a) is construed *in pari materia* with ORS 419.474 (2) and 419.476 (1)(e), "we find the requisite specificity." I do not agree. ORS 419.474(2) provides no more than that these statutes "shall be liberally construed" to the end that a child may receive such care as will lead to its welfare and that the court may secure care that best meets its needs. ORS 419.476(1)(e) confers jurisdiction of the court over a child whose parents have "failed to provide him with the care, guidance and protection necessary for his physical, mental or emotional well being."

Furthermore, there is a well-organized distinction between proceedings for temporary custody of juveniles by reason of parental neglect and proceedings for permanent termination of parental rights. See Note: "Legislative and Judicial Recognition of the Distinction Between Custody and Termination Orders in Child Custody Cases," 7 Journal of Family Law 66 (1967). Indeed, the state in this case concedes that violation of ORS 419.523(2)(a) or (b) must be established "in addition to a finding of jurisdiction under ORS 419.476."

See also the distinction recognized by this court in Simons v. Smith, *supra*, pp 280-81, as quoted in this opinion.

The sole standard provided by ORS 419.523 (2)(a) for application in determining whether the rights of parents in their own children may be permanently terminated is that of determining whether such parents are "unfit by reason of conduct or condition seriously detrimental to the child." Such a purported "standard" fails to meet the requirements of due process both because it "leaves the public uncertain as to the conduct it prohibits" and also because it "leaves judges * * * free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case."

I do not agree with the majority statement that the statute "gives adequate notice (to parents) of the kind of conduct involved" and that "the ordinary parent should 'get the message' from the statute as it is now worded." The language of ORS 419.523 (2)(a) is so vague as to fail completely to notify parents of the conduct it prohibits. Also, I do not agree with the contention of the state that "the concept of warning implicit in appellant's demand for definite statutory language is inappropriate." While I agree that the constitution does not require "impossible standards," the language of a statute must "convey(s) sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices," as held in *United States v. Petrillo*, 332 US 1, 7-8, 67 S Ct 1538, 91 L ed 1877 (1947), and as quoted with approval by the state in its brief in this case.

I also do not agree with the holding by the majority that the statute provides a sufficient standard so as to restrain juvenile courts from exercising an "unbridled discretion" in such cases. The answer by the majority to this most serious question is to state, without support by any authority, that juvenile

courts do not have "unbridled discretion" under this statute because it is "only when the parent's conduct is seriously detrimental to the child can parental rights be taken away." To me, this is not a responsible answer to a serious question, but begs the entire question.

The majority cites *State v. Grady*, 231 Or 65, 371 P2d 68 (1962); *State v. Easley*, 228 Or 472, 365 P2d 293 (1961), and *State v. Blum*, 1 Or App 409, 463 P2d 367 (1970), for the proposition that parental misconduct must be "seriously detrimental" to the welfare of the child to support a termination of parental rights. None of these cases are in point, however, since in none of them was the constitutional validity of this statute in issue, including the question whether the term "seriously detrimental to the child" provides a sufficiently definite standard or one that is so "loose" and "vague" as to be constitutionally invalid.

Indeed, to me it cannot be reasonably contended that a statute under which a judge is to decide for himself what conduct by a parent is "seriously detrimental" to a child provides a "standard" for application in making that decision and prevents a judge from acting upon recommendations by welfare representatives and from exercising an "uncontrolled discretion, however benevolently motivated."

In *Hodges* the "looseness" of the language of the statute involved in that case (ORS 167.210) was held to encourage the prosecution to rid the community of individuals "deemed subjectively less desirable than other offenders," resulting in a "catch-all clause" as an "instrument of potential abuse." So also the "looseness" of the language of ORS 419.523 (2)(a) could encourage welfare representatives to institute

proceedings to terminate the rights of parents deemed subjectively less "fit" than other parents and thus also result in a similar "catch-all," as an "instrument of potential abuse."

The majority would distinguish *Hodges* on the ground that a criminal statute was involved in that case, while ORS 419.523 is not a criminal statute, and also is not a regulatory statute under which the state is "pitted" against an individual. Thus, the majority contends that this statute is to be administered by the courts solely in the "best interests" of children and with a "flexibility" similar to that involved in the conduct of an administrative agency, rather than the enforcement of a criminal statute.

In my opinion, however, even though this is not a criminal proceeding, the rights of parents are nevertheless entitled to constitutional protection. If parents are entitled to such protection before they can be deprived of their property, surely parents are entitled to such protection before their rights as parents can be terminated and their children put up for adoption over the objection of their parents.

In *State v. Jamison, supra,* this court recognized that a proceeding under ORS 419.523, although "not a criminal matter," is subject to constitutional requirements of due process for the reason that "the permanent termination of parental rights is one of the most drastic actions the state can take * * *."

And even in *Morrison v. State Board of Education, supra* (relied upon by the state in this case), the California Supreme Court said (at p 387):

> "Civil as well as criminal statutes must be sufficiently clear as to give a fair warning of the conduct prohibited, and they must provide a standard

or guide against which conduct can be uniformly judged by courts and administrative agencies."[5]

It must be remembered, however, that neither the validity of the current trend away from deciding proceedings for termination of parental rights by emphasis upon the rights of the parents and toward a greater emphasis upon "the best interests of the child," nor the proposition that this question of policy is one to be decided by the legislature, rather than the courts, are issues to be decided in this case. The issue in this case is not whether the rights of the parents are more important than those of the child, but whether the statute involved in this case is sufficiently definite to satisfy the constitutional requirements of due process.[6]

It is also contended by the majority that it would be difficult to accomplish the primary purpose

---

[5] Among other cases holding other statutes or opinions to be invalid for vagueness, however, see Gelling v. Texas, 343 US 960, 72 S Ct 1002, 96 L ed 1359 (1952), holding invalid an ordinance authorizing denial of a license for the showing of a motion picture deemed to be "of such character as to be prejudicial to the best interests of the people of said city"; Moore v. Vincent, 174 Okla 339, 50 P2d 388 (1935), and State ex rel Spriggs v. Robinson, 253 Mo 271, 161 SW 1169 (1913), both holding statutes invalid which authorized revocation of professional licenses for "unprofessional conduct."

See also Cline v. Frink Dairy, 274 US 445, 463, 47 S Ct 681, 71 L ed 1146 (1927); and A. B. Small Company v. American Sugar Refining Company, 267 US 233, 239, 45 S Ct 295, 69 L ed 589 (1925). See also Note: "Due Process Requirements of Definitions in Statutes," 62 Harv L Rev 78 (1948).

[6] Thus, defendant contends in this case, with considerable plausibility:

"The positions of plaintiff and defendant are not irreconcilable. On the contrary, it appears that the best interests of children, parents, and society not only require, but would be best served by, the implementing of a statute which gives adequate notice to society and adequate guidelines upon which the court can make its decision. Such a statute in no way defeats the ultimate purpose of a termination proceeding—to decide what is in * * * the child's best interests."

of the statute, to protect the welfare of children, and be "more specific" than the provisions of this statute. On the contrary, the trend is for legislatures to make the rules regarding parental "unfitness" more strict and definite.[7] And it is conceded by the state in this case that "the legislature had the option of setting forth a list of conditions and conduct which could guide the courts specifically and render the procedure conveniently mechanical," but that it chose instead to adopt "general, inclusive terms," in an effort "to protect the child and to protect parents."[8]

For all of these reasons, it is my view that ORS 419.523 (2) (a) is constitutionally invalid for vagueness and indefiniteness, with the result that the trial court erred in overruling the demurrer to the petition on that ground.

I do not disagree with the further holding by the majority to the effect that the evidence of misconduct by the parents in this case was not sufficiently serious so as to provide a proper basis for termination

---

[7] See Note, *supra*, 7 Journal of Family Law 66, at 77 (1967). See also Simpson, The Unfit Parent: Conditions Under Which a Child May be Adopted Without the Consent of His Parent, 39 U of Detroit L J 347, 355, 362-69.

[8] It is also of interest to note that even under Oregon Code 1930, § 33-619, as considered by this court in In re Schein, *supra*, the definition of a "dependent child," together with the grounds for declaring a child to be "dependent," so as to terminate parental rights in such a child, were stated in the following terms:

"Persons of either sex under the age of eighteen years, who for any reason are destitute, homeless, or abandoned; or are dependent upon the public for support; or have not parental care or guardianship; * * * or whose home *by reason of neglect, cruelty, drunkenness, or depravity on the part of parents,* guardians, or other persons in whose care it [they] may be *is an unfit place for such children;* * * * whose parents * * * fail to exercise proper parental discipline and control over them are classed as neglected children." (Emphasis added)

of their parental rights by permitting adoption of the child over their objection. To me, however, the fact that the majority of this court consider themselves to be in a better position to decide that question than an able trial judge, after years of experience in such matters and after observing both the parents and all of the other witnesses—and to reject his findings purely as a matter of judgment, without application of any legal criteria or standards—serves only to further demonstrate and emphasize the unconstitutional vagueness of ORS 419.523 (2)(a) and the absence of any proper standards for application by the courts in making such a decision.

The trial judge found that "it would be a tragedy for Anna to return her" to the McMasters' home, where she had never lived, and to move her from a home of foster parents, who had given her excellent care and desired to adopt her. Accordingly, he held that it was in her best interests that the rights of her natural parents should be terminated.

I cannot understand how the majority of this court can reverse that decision without making a purely subjective judgment, without control or guidance by any statutory standards. In my view, the decision whether or not to destroy the rights of parents cannot be constitutionally decided in such a manner.

For all of these reasons I disagree with the basis for the majority opinion, but concur in the result.

McAllister, J., concurs in this opinion.