Argued and submitted July 6, reversed August 23, 1995

In the Matter of
Stephanie Darlene Payne, a Child.

STATE ex rel
CHILDREN'S SERVICES DIVISION,
*Respondent,*

*v.*

Dianna R. PAYNE
and Michael E. Payne,
*Appellants.*

(94-5738; CA A87112 (Control))

In the Matter of
Joshua Michael Payne, a Child.

STATE ex rel
CHILDREN'S SERVICES DIVISION,
*Respondent,*

*v.*

Dianna R. PAYNE
and Michael E. Payne,
*Appellants.*

(94-5739; CA A87113)

In the Matter of
Matthew Scott Payne, a Child.

STATE ex rel
CHILDREN'S SERVICES DIVISION,
*Respondent,*

*v.*

Dianna R. PAYNE
and Michael E. Payne,
*Appellants.*

(94-5740; CA A87114)

In the Matter of
Michael Emerson Payne, a Child.

STATE ex rel
CHILDREN'S SERVICES DIVISION,
*Respondent,*

*v.*

Dianna R. PAYNE
and Michael E. Payne,
*Appellants.*

(94-5741; CA A87115)

901 P2d 863

James A. Palmer argued the cause and filed the brief for appellant Michael E. Payne.

Sheila A. Dale argued the cause and filed the brief for appellant Dianna R. Payne.

John T. Bagg, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

Mother and father appeal from judgments of the trial court terminating their parental rights to four of their five children. We review *de novo*, ORS 419A.200, giving due weight to the trial court's findings involving issues of credibility, because it had the opportunity to observe the witnesses firsthand. *State ex rel Juv. Dept v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990); *State ex rel Juv. Dept. v. Boren*, 105 Or App 599, 601, 806 P2d 149 (1991). We reverse.

The issue here is whether the Children's Services Division (CSD) proved by clear and convincing evidence that mother and father are "unfit by reason of conduct or condition seriously detrimental" to the children to parent the children, and that integration of the children into the parents' home "is improbable in the foreseeable future due to conduct or conditions not likely to change." ORS 419B.504.

The facts are largely undisputed. Mother and father were married in 1981 and have five children, four of whom are involved in this case.[1] In July 1992, CSD received two reports regarding the welfare of the children. Based on the reports, a CSD caseworker, Nelson-May, developed concerns that possibly father was abusing mother, that the children were malnourished and that there was physical and emotional abuse of the children. The reports also indicated that mother and father had drug- and alcohol-abuse problems.

On July 23, 1992, Nelson-May contacted mother at the family's residence. Nelson-May discussed the reports with mother. Mother denied that any abuse of the children had occurred and that either parent abused drugs or alcohol. Nelson-May testified that she found the home to be in a sanitary and safe condition. The children were happy and appeared healthy. When mother told Nelson-May that they were being evicted as of mid-August, Nelson-May offered suggestions about how to find housing. Mother did not appear to be under the influence of drugs or alcohol. Nelson-May observed no drugs nor drug paraphernalia. Nelson-May did not ask whether mother drank, nor did she ask how often or

---

[1] At the time of trial, the fifth child, born in July 1993, was living with mother and father and was not involved in this case.

how much father drank. CSD did not open a case on the family at that time.

Nelson-May received two additional reports concerning the family in September 1992. The reports stated that the family had inadequate housing and food and were camping near an overpass on Interstate 84. The reports alleged that parents did not supervise the children. The reports also alleged that father was abusing drugs and alcohol. Nelson-May later testified that, at that point, she had decided to take the children into protective custody based on concerns she had about drug and alcohol abuse. Nelson-May contacted Detective Hawkins to accompany her on a trip to the campsite to get the children.

Before going to the campsite, Hawkins discovered that there was a warrant for mother's arrest for failing to appear on a driving-while-suspended charge. On September 18, 1992, Hawkins and Nelson-May contacted mother and the four children at their campsite in Biggs, Oregon. Father was at work at a gas station nearby. The family had their car parked in a grove of trees with a lean-to set up next to the car. Mother told Hawkins and Nelson-May that the children slept in the car and that she and father slept in the lean-to. There was a camp heater, a camp stove and an unloaded shotgun in the lean-to. It was warm outside. Mother showed Nelson-May that they had food and water. Mother stated that she bathed the children at a friend's home. She told Nelson-May that father's income was approximately $1,000 per month and that the family had money for rent if they could find a place with sufficient living space.

Mother did not appear to be intoxicated. There was no evidence of drugs or drug paraphernalia at the campsite, but there were some beer cans on the ground. Nelson-May never saw any indications of abuse of the children or of mother. The children looked happy and played around the campsite while Hawkins and Nelson-May spoke with mother. During the visit, mother was responsive and looked after the children. Mother demonstrated appropriate parenting skills, in Nelson-May's opinion.

Nelson-May asked whether there was someone who could look after the children. Mother stated that the children

had, at times, stayed with father's sister who lived in Irrigon, Oregon. Hawkins arrested mother on the warrant. Later at the jail, Nelson-May had mother sign a voluntary custody agreement for each child. The agreements gave CSD temporary custody of the children and provided that either party could terminate the agreement within 48 hours of written notice. Father never signed the custody agreements. Mother was released from custody that same day, and was angry to find out that the children had not been sent to father, but, rather, had been sent to their aunt in Irrigon.

Nelson-May and another caseworker, Hilton, met with mother at the campsite on September 29, 1992. Nelson-May told mother that she needed to find suitable housing in order to get the children back, and that Hilton was available to help mother find housing. Father called CSD on November 3, 1992, to notify Nelson-May that they had found a place to live at a motel in Biggs, Oregon.

Nelson-May met with mother at the family's cabin at the Biggs Motel on November 13. She testified that the cabin was a three-room apartment, with a main room, a bathroom and a kitchen. Mother told Nelson-May that she thought the housing was adequate for the family. Nelson-May did not think the cabin was large enough for two adults and four children. The purpose of the visit was to present mother and father with CSD service agreements and to provide them with bus vouchers so that they could visit the children.[2]

The service agreements given to mother provided, among other things, that, in order to get their children back, mother and father were to secure "adequate housing," to participate in alcohol and drug evaluations and to forbid "drugs or alcohol to be used in the residence" in which they lived. Mother became angry while reading the agreements. She voiced anger about the children having been removed from the home and stated that neither she nor father would sign the service agreements.

---

[2] The bus vouchers given to mother were one way, from Biggs to Irrigon. As it turned out, the bus driver would not accept the vouchers, and mother had to find her own ride to go visit the children. Mother went and stayed with the children for just over two weeks, from November 25 until mid-December. Father also visited the children for a day or two at Christmas.

In December 1992, CSD filed a petition asking the court to order a preliminary hearing to determine the best interests of the children. An affidavit filed in support of the petition alleged that "the parents are unable to care for their children and provide the guidance and protection necessary at this time." In February 1993, the court entered orders providing that the children would remain in the custody of CSD.

In January 1993, CSD became aware that two of the children had been sexually molested by their cousins while staying at their aunt's house. Consequently, on January 27, 1993, CSD removed the children from their aunt's care and placed them in a foster home in The Dalles. The Dalles is about 20 miles from Biggs. In February 1993, Nelson-May transferred the case to another CSD worker, Stockman.

During the ensuing months, mother looked for more spacious housing on several occasions. Hilton testified that there was not "much available out in this particular area." She stated that the size of the family made finding housing very difficult. She also stated that the few houses that were suitable were not available until some time in the future. Mother and father failed to provide Hilton with information she needed to assist them, and parents were unsuccessful in finding more spacious housing.

Stockman sent several letters to mother and father between February and September 1993 outlining the steps parents needed to complete to regain custody of the children. Stockman told mother and father that they needed to (1) participate in drug and alcohol evaluations,[3] (2) obtain and maintain adequate housing and (3) visit the children regularly. Stockman notified mother and father that transportation would be provided for them to visit their children if they called CSD by 10 a.m. the morning of the visit and that, if CSD did not hear from parents, the visit would be canceled.

Stockman repeatedly told parents that, unless they visited the children and complied with the terms of the service agreements (which parents had never agreed to), CSD would

---

[3] Mother and father did report for intake evaluations for drug and alcohol abuse in May 1993. No diagnosis was reached for either mother or father, however, because they attended no appointments after the initial interview.

seek termination of their parental rights. Between February 1993 and March 1994, mother attended 21 out of 61 possible visits with the children. Father attended only 8 visits. Parents became less and less cooperative with CSD after April 1993.

On September 20, 1993, Stockman sent letters to mother and father, as well as to their attorneys, notifying them that CSD planned to file petitions seeking termination of their parental rights. Each letter stated that, because CSD was seeking termination, CSD would no longer work with either parent and would not refer them for additional services. Subsequent letters stated that mother and father still would be allowed to visit their children. Between April and November 10, 1994, neither parent visited the children. The petitions for termination were filed in August 1994.

The numerous allegations in the petitions were identical as to mother and father. The petitions alleged that the parental rights of mother and father should be terminated because parents were "unfit by reason of conduct or condition seriously detrimental" to the children.[4] *See* ORS 419B.504.

---

[4] The petition alleged that parents were unfit due to:

"A. Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"B. Lack of effort or failure to obtain and maintain a suitable or stable living situation for the [children] so that return of the [children] to the [parents] is possible.

"C. Failure to present a viable plan for the return of the [children] to the [parents'] care and custody.

"D. Failure to learn or assume parenting and housekeeping skills sufficient to provide for the safe and proper raising of the [children].

"E. Emotional illness, mental illness, or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"F. Mental, emotional and/or psychological abuse of the child.

"G. Physical and emotional neglect of the child.

"H. Lack of effort by the [parents] to adjust [their] circumstances, conduct or conditions to make return of the [children] possible.

"I. Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"J. Abandonment of the [children]."

Those allegations mirror statutory factors that bear on termination. *See* ORS 419B.504; ORS 419B.506; ORS 419B.508.

The petitions further alleged that parents had neglected to provide for "the basic physical and psychological needs of the [children] for six months prior to the filing of the [petitions]." *See* ORS 419B.506.

The court found that the state had failed to prove most of the allegations in the petitions by clear and convincing evidence.[5] However, the court terminated both parent's rights. The court stated:

> "What needed to be done for these children to come home was very simple, and it involved three steps: visit them, get housing, get an evaluation and follow through with any recommended treatment. You have taken none of those three steps. Now, I don't doubt that both of you love your children. Based on the evidence I've heard in this trial, I don't doubt that your children love you. * * *
>
> "* * * * *
>
> "And I think both you and Mr. Payne — perhaps with good cause, I don't know — you have a resentment towards the State that makes it almost impossible for you to work with the State, and perhaps the die was cast toward this result the date these children were taken sometime in 1992. I don't know. Wish it hadn't come to this. I don't think it need have come to this, but here we are."

The reasons given by the court in its judgments terminating mother's and father's parental rights are:

> "A.  Lack of effort or failure to obtain and maintain a suitable or stable living situation for the [children] so that return of the [children] to [parents] is possible.

---

[5] The court made oral findings at the end of the termination proceeding:

"I'm not satisfied that either of you is subject to the excess use of alcohol or drugs; that's not been proven. It's not been disprov[en]. I don't know.

"It's not been proven that you have failed to learn or assume parenting and housekeeping skills sufficient to provide for your children. I think you have those skills. The State has alleged emotional and mental illness — or mental deficiency. That's not been proven in either of your cases.

"It has alleged mental, emotional and psychological abuse of the children. That's not proven in exactly that sense. The State has alleged both physical and emotional neglect of the children. There's been no proof of any physical neglect of the children, although a lot of need."

Upon a thorough examination of the record, we agree with the trial court's conclusions regarding those allegations.

"B.   Failure to present a viable plan for the return of the [children] to the [parents'] care and custody.

"C.   Emotional neglect of the [children].

"D.   Lack of effort by the [parents] to adjust [their] circumstances, conduct or conditions to make return of the [children] possible.

"E.   Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"F.   Abandonment of the [children]."[6]

The court terminated mother's and father's rights because it determined that parents neglected the basic physical and psychological needs of the children and that parents' conduct was seriously detrimental to the children and the children's integration into parents' home. ORS 419B.504; ORS 419B.506.

As the trial court correctly pointed out, CSD required parents to take three steps to regain custody of the children: (1) obtain "adequate" housing, (2) complete drug and alcohol evaluations and (3) visit the children regularly. All the reasons given by the trial court for terminating parents' rights relate to one or more of those conditions. We have reviewed the record to determine whether parents' failure to comply with the conditions merits termination of their parental rights.[7]

---

[6] The court also found that, for the six months preceding the termination, parents had:

"A.   Fail[ed] to maintain regular visitation or other contact with the [children] which was designed and implemented in a plan to reunite the [children] with the parent.

"B.   Fail[ed] to contact or communicate with the [children].

"C.   Fail[ed] to contact or communicate with the custodian of the [children].

"D.   Fail[ed] to implement a plan designed to lead to the integration of the [children] into the [parents'] home."

[7] We note, as an initial matter, that the record demonstrates that children were adequately cared for while in parents' care. When Nelson-May visited the family, she saw no signs of abuse or neglect. She also saw no signs that mother or father was abusing drugs or alcohol. The children appeared happy and healthy. And as Nelson-May herself admitted, homelessness in and of itself is not a child protective service issue.

■ Parents' failure to comply with CSD's requirement that they obtain "adequate" housing was not a legitimate reason to terminate parents' rights. ORS 419B.504 provides that a parent's rights may be terminated for conduct that is "seriously detrimental" to a child. There is no persuasive evidence in this record that returning the children to parents' small residence would have caused any harm to the children.

This case does not approach the severity of the circumstances in *State v. McMaster*, 259 Or 291, 486 P2d 567 (1971). In that case, the evidence showed that

> "the parents frequently quarreled, McMaster never held a job more than a month and seldom that long, they were usually on welfare, and McMaster frequently left home with the welfare check, leaving Mrs. McMaster destitute. They were unable, particularly Mr. McMaster, to handle their financial affairs."

*Id*. at 302. Even so, the court observed that "the state of the McMaster family is duplicated in hundred[s] of thousands of American families, — transiency and incapacity, poverty and instability." *Id*. at 303. The court held that parental rights cannot be terminated simply because "the natural parents are unable to furnish surroundings which would enable the child to grow up as we would desire all children to do." *Id*.

At the time of termination, mother and father had been living in the same residence for nearly two years. Their living situation was relatively stable. There was no evidence that the home was unsafe or unsanitary. CSD had made no effort to remove parents' other child from the home. Although it would have been preferable for the family to live in a more spacious home, it was not a reason for termination that parents did not inhabit one. As Hilton testified, homes for a family of that size are difficult to find in that area. Absent some showing that living in the smaller residence would be "seriously detrimental" to the children, we do not believe parents' housing was an adequate basis to terminate their parental rights.

■ We turn next to CSD's requirement that parents complete drug and alcohol evaluations. We agree with the trial court that the state failed to prove that either mother or father abused drugs or alcohol. Under the circumstances,

parents' failure to participate in the required evaluations was not a legitimate reason to terminate their parental rights.

Most of the trial court's reasons for terminating parents' rights relate to their failure to visit their children once they were removed from the home. Clearly parents, especially father, failed to maintain consistent contact with the children. We are persuaded, however, that CSD's conduct contributed to the problem.

■ Mother and father both resented CSD's involvement from the beginning. The children were first sent to live in Irrigon, 80 miles from parents. Neither parent legally could drive or had access to a car. Once CSD provided bus vouchers, even though the bus driver did not accept them, mother went to visit the children. Parents' failure to visit consistently during that time was not without reasonable cause. *See* ORS 419B.506.

With respect to visitation after the children were moved into foster care, both parents testified at the termination proceeding of their regret about failing to visit the children more regularly. On the other hand, both mother and father expressed dissatisfaction with the visits they did attend. Transportation was consistently a problem. Although mother was supposed to call by 10 a.m. to arrange a ride to the visits, it was not always possible for her to do that. The family did not have an operable telephone. Neither CSD nor mother ever suggested an alternative way for mother to notify CSD of her intention to visit.[8]

---

[8] The record indicates that CSD did not, in every instance, demonstrate dedication to reuniting parents with the children, but, rather, responded inflexibly to parents' requests to visit the children. Parents asked to reschedule visits with the children and to have unmonitored visits. CSD refused their requests.

For example, on one day mother called at 10:10 a.m. to arrange a ride to come visit the children and was told it was too late and that CSD would not provide a ride. On another occasion, mother called to schedule a visit and was told she could not visit because the two older children were unavailable. When she asked if she could visit the younger two children, CSD responded that it would not allow such an arrangement because it would not be "fair" to the older children. Mother then asked if she could come the following day (a regular visitation day) and was told she could not because the caseworker was going to be out of the office. Mother asked if someone else could supervise the visit and was told that that was not an option. Several of the visits were canceled due to bad weather. On at least one occasion, mother showed up for a visit and was not allowed to see the children.

Mother also asked on several occasions if they could arrange for an overnight

Stockman testified that she had observed during visits parents did attend that mother and father demonstrated appropriate parenting skills. Neither mother nor father attempted to turn the children against their foster family or against CSD. Stockman observed that mother dealt particularly well with the children. All CSD workers testified that it was obvious that parents loved the children and that the children loved their parents.

■        Concededly, the lack of visitation was detrimental to the children.[9] There is no evidence, however, of emotional or physical abuse of children by parents. Considering the lack of any harm suffered by the children while in their parents' care, we cannot say that parents' failure to cooperate with CSD's visitation schedule is a sufficient reason in and of itself to terminate parents' rights.[10] Both mother and father testified that, if their rights were not terminated, they would make a more concerted effort to visit the children on a regular basis.

---

visitation or if they could spend a weekend together and CSD denied her requests. Mother testified that she felt that every time she suggested an alternative visitation, CSD would deny her requests. She testified that, by March 1994, she felt that she just could not deal with the situation anymore.

CSD usually would not allow father or mother to visit with the children without CSD monitoring the visits. Father testified that he missed the children very much, but that he resented having all his actions ordered and monitored by CSD. He stated that he did not go to visits because he believed, based upon Stockman's comments to him, that the visits upset the children. Father believed the situation to be hopeless and that he would not get his children back even if he did everything CSD told him to do.

[9] A therapist who worked primarily with two of the children testified that the lack of parental visitation had a harmful effect on one of them, harming his self-esteem. The therapist testified, however, that the child appeared to have had early bonding with his parents. The therapist testified that, in her opinion, the child needed to have a decision made about where he would be living long term. She did not think it would be helpful for him to live in foster care and continue to be visited by his parents.

[10] The state argues that parents had a "responsibility" to cooperate with CSD to secure the return of their children. Although that may be true, hostility toward CSD is not an acceptable reason to terminate an individual's parental rights. This case is distinguishable from *State ex rel Juv. Dept. v. H.*, 62 Or App 288, 659 P2d 1027 (1983), which the state cites in support of termination. In that case, there was evidence of ongoing physical abuse, and the parents were unwilling to cooperate with any of CSD's requirements over the three-year period that the child had been absent from the parents' home. Also distinguishable is *State ex rel Juv. Dept. v. Dee*, 19 Or App 193, 526 P2d 1036 (1974). In *Dee*, the father was an inmate in prison, where he had spent 11 of the preceding 22 years. He had not seen his daughter in seven years and had made no effort to maintain contact with her.

■    In this case, the court listed "[a]bandonment of the [children]" as a reason for termination. ORS 419B.508. We do not believe the evidence in this case supports the conclusion that parents abandoned their children. At various points in the process, parents voiced their desire to have the children returned to them. The lack of visitation was caused by parents' resentment toward CSD and logistical problems, and did not constitute evidence of abandonment. We find that the conduct by parents in this case was not sufficiently detrimental to the children to provide a proper basis for termination.

Reversed.