Argued May 19, 1978, reversed January 15, petition for review denied February 13, Supreme Court review allowed March 27, 1979, 286 Or 1

In the Matter of Krueger, Edward Lee, a child,
STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMATH COUNTY, *Appellant,*
*v.*
EAST, *Respondent.*
(No. 52,344, CA 9668)
589 P2d 744

Melinda L. Bruce, Assistant Attorney General, Salem, argued the cause for appellant. With her on the brief were James A. Redden, Attorney General, and Al J. Laue, Solicitor General, Salem.

William J. Howe, III, Portland, argued the cause for respondent. With him on the brief was Delo & Howe, Portland.

John W. Danner, Portland, waived appearance for child.

GILLETTE, J.

**GILLETTE, J.**

The state, acting on behalf of the child, appeals an order of the juvenile court which denies termination of mother's parental rights.[1] We must first determine if the order in question is appealable. *City of Hermiston v. ERB,* 280 Or 291, 570 P2d 663 (1977).[2] We conclude that it is. On the merits, we conclude that the mother's parental rights should be terminated and reverse.

## I. APPEALABILITY

■ Appeals under the Oregon Juvenile Code, ORS ch 419, are authorized by ORS 419.561(1) which provides, in pertinent part,

> "Any person whose rights or duties are adversely affected by a final order of the juvenile court may appeal therefrom. * * *."

The child is a person. No "duty" of the child is involved. The question thus becomes (1) whether the ruling in question here affected a "right" of the child, (2) is an "order" and (3) is "final."

### 1. *"Right" of the Child*

In *State v. McMaster,* 259 Or 291, 296, 486 P2d 567 (1971), the Supreme Court stated,

> "The procedure here [whereby parental rights are terminated] is not the state against the parents. *Three parties are involved:* the state, the parents and the child. The welfare of the child is the primary consideration * * * ORS 419.474 * * *. This emphasis upon the welfare of the child does imply * * * that, unlike criminal statutes in which the interests of only one set of individuals is involved, the constitutional issue must be examined with the *interests of both* the child and the

---

[1]The child, acting through his own court-appointed attorney, waived the opportunity to appear separately but indicated he was in complete agreement with [State's] position in this matter and would not submit a brief.

[2]We have entertained at least two similar appeals in the past, but the question of appealability was not raised. *See State ex rel Juv. Dept. v. Dubell,* 28 Or App 449, 559 P2d 1302 (1977); *State ex rel Juv. Dept. v. Zinzer,* 20 Or App 688, 533 P2d 355 (1975).

parents [in mind]. What might be unconstitutional *if only the parents' rights were involved* is constitutional if the [termination of parental rights] statute adopts legitimate and necessary means to protect *the child's interests.* In our opinion it does." (Emphasis added.)

We think it patent that the Supreme Court in *McMaster* felt that a right of the child was involved in termination proceedings. We adopted basically the same view when, citing *McMaster,* we referred to children as "equal parties to the [proceeding to terminate parental rights]" in *State ex rel Juv. Dept. v. Wade,* 19 Or App 314, 318, 527 P2d 753, *former opinion adhered to* 19 Or App 835, 528 P2d 1382 (1974), *rev den, cert den* 423 US 806 (1975). We elaborated,

"That children have an interest in the outcome of termination actions which is worthy of all the protection afforded the interests of their parents is apparent. *The basic human right* to maintain and enjoy the relationship which normally exists between the parent and the children *is held no less by the children than by the parents* * * *." *Id.,* at 319. (Emphasis added.)

In *Wade,* we faced the question of whether a child who was entangled in termination proceedings was entitled to legal representation separate from either of the two other parties, the parents and the state. We held that a child was so entitled. *Id.,* at 323. Although we have since modified the apparently absolute requirement of appointment of counsel created in *Wade,* we have adhered to our view with regard to the child having independent rights in such proceedings:

"* * * [A]s parties in both termination and adoption proceedings children possess rights of which they may not be deprived arbitrarily." *F. v. C.,* 24 Or App 601, 610, 547 P2d 175, *rev den* (1976).

We conclude that a decision in a termination case affects a "right" of a child, *viz.,* the opportunity to live with fit parents in a nurturing environment. *See* ORS 419.494; 419.498(2); 419.525; 419.527(1)(a); 419.563(1).

## 2. *"Order"*

ORS 419.561(1) speaks of an "order." The action appealed from here is denominated as such, it disposes of a petition duly filed, and it directs that certain things be done which were not being done at the time it was entered. However, labels are not a substitute for analysis.

We have examined a purported "order" in a previous case and declined to entertain an appeal therefrom because the action appealed from was not an order. *State ex rel Juv. Dept. v. Nagle,* 36 Or App 237, 584 P2d 338 (1978). In *Nagle,* a child was found to be within the jurisdiction of the court and temporarily committed to the care of the Children's Services Division (CSD). That order—which is appealable, *see, e.g., State ex rel Juv. Dept. v. A.,* 28 Or App 43, 558 P2d 1234 (1976)—was not appealed. A review hearing contemplated by the initial order was held later. The court order arising out of this later proceeding extended the *status quo* and provided for another review.

We held the order to be nonappealable, stating,

"* * * The order merely continues the existing placement under the wardship. Except for form, it is more of a commemorative comment than an order. It makes no new or additional disposition. No authority is granted to CSD as custodian that had not been granted in the initial order. *No right of the appellant is diminished; no duty enlarged. No motion of any party is granted or denied.* Had there been no order, the status of the wardship would be no different. Therefore, there is no legal event with appellate significance. There was merely a supervisory look at an ongoing wardship with no substantial change ordered.

"* * * [W]e do not hold that all acts of the juvenile court after the initial creation of wardship are insulated from appellate scrutiny. Rather, *we hold only that where there is no substantial change in the nature or degree of the conditions relating to the wardship or where a right or duty is not affected by a ruling on a motion,* there is no appealable order * * *." *Id.,* at 240-241. (Emphasis added.)

[ 63 ]

Here, unlike *Nagle,* a right has been affected by a ruling on a motion: so far as the facts adduced at this termination hearing are concerned, the child's right to be free of a continuing seriously detrimental relationship with his parent is now lost unless he can appeal *this ruling.* We conclude that the order entered here is an "order" for the purposes of ORS 419.561(1).[3]

## ■ *"Final"*

As our analysis above suggests, we conclude the court's order here is also "final" for the purposes of ORS 419.561(1): (1) the petition for termination is "dismissed," *i.e.,* denied, and (2) the court's factual findings and legal conclusions now settle the issue presented. The findings may even be *res judicata*[4] with respect to the facts litigated, thereby forever foreclosing judicial review unless that review occurs now.

The realities of the situation in this case lend weight to our decision in favor of appealability.

The present petition was filed on August 18, 1977, by the Multnomah County Juvenile Department.[5] It alleged, in only slightly modified statutory language, that the mother was unfit due to (1) a lack of effort to

---

[3] Our decision in *State ex rel Juv. Dept. v. Brown,* 33 Or App 423, 576 P2d 830 (1978), is not *contra,* although certain of our language there could be misconstrued. In *Brown,* we held that an order denying remand of a juvenile to adult court is not final because it "does not end juvenile court jurisdiction." We did not mean to suggest by that language that whether or not an order is appealable depends upon whether it ends juvenile court jurisdiction *entirely,* for such would be contrary to our precedents. *See State ex rel Juv. Dept. v. Nagle, supra; State v. Peterson,* 3 Or App 52, 54, 471 P2d 853 (1970) (order establishing wardship is appealable); *State ex rel Juv. Dept. v. Mack,* 12 Or App 570, 507 P2d 1161 (1973) (order terminating parental rights is appealable). Rather, what we meant to indicate in *Brown* was that the state had no sufficient interest in having the child's acts adjudged in "adult" court, as opposed to juvenile court, to justify treating a decision to retain jurisdiction in the juvenile court as an appealable order.

[4] *See Dean v. Exotic Veneers,* 271 Or 188, 531 P2d 266 (1975). We need not and do not decide the *res judicata* question here.

[5] Termination of parental rights after notice and a hearing is specifically authorized by ORS 419.523 and 419.525. "Any person" may file such a petition. ORS 419.482(1); 419.476(1)(c), (d) and (e).

adjust her circumstances, conduct and condition to make return of the child to her possible, and (2) no lasting adjustment appearing likely in the foreseeable future.

On November 28, 1977, the juvenile court dismissed the petition in an order which recited, *inter alia,* that

"\* \* \* Counsel for the child and the Deputy District Attorney presented the case on behalf of the petition for termination. The attormey for the mother presented her side of the case. From the cumulative [sic] testimony, the exhibits received, and the demeanor of the witnesses, the *Court finds the [the pertinent allegations] had [sic] not been proven by a preponderance of competent evidence.* The petition was [sic] accordingly dismissed." (Emphasis added.)

The court went on to continue the wardship, leave the child in custody of CSD, and make certain directions with respect to the efforts CSD was to make in attempting to integrate the child into the mother's home. The court specifically stated,

"[The child] \* \* \* is continued under temporary commitment to Children's Services Division *with the strong recommendatio[n] to Children's Services Division that all efforts now be extended to reunite the child with his mother* \* \* \*." (Emphasis added.)

The trial judge had decided that this child will not be separated from this parent on the facts that have been proved. Put differently, in that judge's mind only the showing of other significant circumstances will cause her to *think* about altering her decision. The child's chance for a better life—if, as the juvenile authorities and the child's own lawyer thought, that chance lay in termination—may now be irretrievably lost. The child, for whose benefit the entire juvenile court system was supposedly designed, cannot now be deprived of judicial review of this outcome.

[ 65 ]

## II. THE MERITS

■ Mother is 27 years old. Although she has three young children, only Edward, her four-year-old, is the subject of this proceeding. Her other two sons, Raymond East II (born 4-5-76) and Raymond East III (born 7-22-77) are the product of her present marriage to Raymond East, Sr. His parental rights are not involved in this proceeding. The couple has lived together since September, 1974, and was married in October of 1975. Mrs. East sees the relationship as stable. Dr. Angell, staff child psychiatrist at the Morrison Center, believes the couple has made progress in improving their marriage.

Eddie, the child who is the subject of the proceeding, was left with a friend of Mrs. East, Patricia Wilhelm, when he was three months old. A written agreement signed by mother indicated that Wilhelm was to have permanent custody of the child, but mother disputes that this was ever her intention. Mother admits that she was unable to care for the child at that time. Wilhelm informed the juvenile court in March of 1974 that Eddie was present in her home. A wardship was established in May of 1974. In July of 1974, Wilhelm requested that the child be removed from her home, and Eddie has been in foster care since that time.

Dr. Angell interviewed the mother and Mr. East but never in the presence of Eddie. Visits with Eddie present were requested by Dr. Angell, but the couple declined his invitations. Linda Lincoln, director of the community mental health nursing program at Morrison, also attempted to have mother and son seen by Dr. Angell in a clinical setting. Mother refused. Dr. Angell believed the parental rights of Mrs. East should be terminated. He said,

> "My assessment is that Mrs. East is an emotionally immature and emotionally unstable person with a strong tendency to dependent and somewhat demanding relationships with other people. I believe that her difficulty meeting her own needs on a consistent, secure fashion

makes her—makes it extremely difficult for her to empathize with the needs of others, primarily her children, on a consistent basis in a way that their needs may be met above hers when that's demanded. I believe that her placement of Eddie out of the home reflects her difficulty in sustaining a caring relationship, when she herself is not sustained by a very secure, caretaking relationship."

On several occasions Children's Services Division (CSD) informed mother and Mr. East what they had to do before Eddie could be returned to them. The couple attended a parenting group at the Morrison Center as part of this program. Mother's attendance at the group for the one and one-half years she participated was described as good by Beverly Kole, parenting group leader at the center. On occasion Eddie attended the group with them. Although Kole did not observe any fearful reaction by Eddie to mother, Kole found she would consistently ask an inordinate amount of questions of the boy. During one session when one of the couple's own two children attended, Mr. East was seen holding a cigarette lighter close to that child's leg. Kole described the incident as a "teasing type thing." She believed that he was curious as to what reaction he could elicit from the mother. Kole described the incident as "rather unusual" in a parenting group. When mother was made aware of the problem she became angry and had Mr. East "knock it off."

The youngest East child was observed by Kole to have bruises on his cheeks at one session. Mother admitted to Kole that her husband "plays rough" with the baby and his pinching apparently caused the bruises. Kole testified that it was not simply the mother's deficiencies that caused her concern about the woman's ability to parent, but the degree and consistency of those deficiencies. Although Kole could not say definitely whether mother was capable at the time of the hearing of being an adequate parent, she

did indicate that the improvement both mother and Mr. East made was not lasting despite years of involvement with various agencies.

The two sons of the East marriage had been made wards of the court pursuant to a stipulated order signed by the couple and the Multnomah County District Attorney's office. The order committing the children to CSD recited:

> "The behavior, condition and circumstances of the above-named children are such as to endanger their welfare, and the above-named children have been subjected to unexplained physical injuries."

The petition in the case of the other two children was based on a complaint filed by a doctor who treated Raymond III for fractures of the leg.

Mrs. Johnstone, Eddie's foster parent for the majority of his life, testified that mother has visited regularly but showed no affection to the child and that he did not respond to her when the visits were in the foster home. The child reacted poorly to mother's visits. When he was older, this reaction was longer in duration. Johnstone also indicated that Eddie began to wet the bed again and occasionally experienced nightmares. He was also found to experience unexplained weight loss during such visits. Mrs. Johnstone testified that the child responds warmly to other people, even new people, but not to the Easts. Weekend visits with the child were discontinued when he was two years old because of his negative reactions.

Deane Piatt, Eddie's CSD caseworker, recommended termination of mother's parental rights based on her three and one-half years of involvement with the family. Although she indicated most of the requirements CSD set out for the couple were met, she believed the family had made insufficient progress in altering the circumstances in the home so that the child could be safely returned to the care of mother. She noted the Easts have never provided any financial support to the child.

Piatt believes mother's responses to the child were inappropriate. In response to a question from the court as to why she believed Mrs. East could not be a nurturing parent to Eddie, Piatt indicated:

"She doesn't know how. It is like she's playing with a doll. When she is with him and when he begins to make demands on her if she could just put him down and walk away like you can a doll, she would be more comfortable.

"One of the things that has concerned me also has been the continuing need for protective services for the younger children who have been in the home and who have recently been removed and are now in foster care. I felt that with the services that have been provided to her for three and a half years for that to have produced that kind of care of younger children boded ill for this little boy. The fact that there were two incidents in which Mr. East struck Eddie when he was on visits with them and which Mr. East admitted to me that he had done raised questions in my mind. Observing the child with them and the fact that they got pouty when he wouldn't go near them even at three years of age, even though he knew them and had visited with them weekly and oftener all of his life caused me to believe that it just wasn't there."

Edward East, Sr. testified his only explanation for the fracture of his own son's leg was a car accident his wife had in her final month of pregnancy. He denied he played too rough with the children, but admitted that he may have "pinched" them too hard. He testified he never intended to hurt them. During an interview with Dr. Angell, East, Sr. got up and pinched the doctor on the face when the doctor asked him whether he thought pinching hurt his son.

Marilyn Redick, child protective worker with CSD, has the two East children as part of her caseload. Stomach bruises on Raymond II were explained to Redick by mother as "love bites" caused by Raymond, Sr. Bruises near the baby's mouth were explained by mother as occurring when "Ray accidentally pinched baby while loving him." In December of 1976, just prior to Raymond II's removal, bruises were observed

on both cheeks. Again, mother told Redick they were "love pinches." During supervised visits with the two East children, Redick observed on several occasions that Ray was too rough with the children, causing them to whimper. Redick recommends termination based on the amount of agency involvement that has occurred and the treatment the other children have received.

Several witnesses, neighbors and friends, testified on mother's behalf. They uniformly indicated that mother kept an extremely neat home, appeared to love her children, and was never seen to abuse them. Those witnesses who had observed Eddie on visits with his mother indicated he was a happy and normal young child.

The trial court judge expressed distrust for Mr. East and his testimony at a subsequent hearing. She also found,

"* * * there is something very odd about Mr. East and he does in fact abuse little children, whether intentionally or unintentionally, and I have had enough child abuse cases in front of me to know what I have got."

In spite of her conclusion, however, the trial judge chose to attempt to reintegrate the child into the mother's home. With due respect to the trial judge, we disagree. In our view, the mother's continued association with Mr. East is inconsistent with continuing her parental rights. The harsh reality—which the trial judge recognized—is that Mr. East abuses children. To place the child in such an environment would be folly, now or in the foreseeable future. The mother's parental rights must be terminated to afford the child a reasonable chance to find an adoptive home at an early age. *See State ex rel Juv. Dept. v. Wade,* 19 Or App 314, 527 P2d 753 (1974).

Reversed.