Argued and submitted August 28, 1992, affirmed March 17, 1993

In the Matter of
A., T., J1. and J2., Children.

## STATE ex rel JUVENILE DEPARTMENT OF CURRY COUNTY
and Children's Services Division,
*Respondents,*

*v.*

Tracy L. RICKS
and Terry Ricks,
*Appellants.*

(90-JU-2753; CA A74233)

848 P2d 630

Gary D. Babcock, Salem, argued the cause and filed the brief for appellants.

John T. Bagg, Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Rossman, Presiding Judge, and De Muniz and Leeson,* Judges.

ROSSMAN, P. J.

---

* Leeson, J., *vice* Buttler, J., retired.

## ROSSMAN, P. J.

Parents appeal from a judgment terminating their parental rights. ORS 419.561. We review *de novo*, ORS 419. 561(1), (5), and affirm.

In early 1988, five-year-old A[1] revealed to her grandmother that her "daddy" had sexually abused her. A had previously told mother about the abuse, but mother had not believed her. Physical examinations confirmed that A had been repeatedly abused. Children's Service Division (CSD) removed both A and her one-year-old sister, T, from the home.

CSD had previously received two complaints about mother's fitness as a parent. Each time, CSD had offered counseling and parenting classes. Mother chose not to participate in those activities. After A and T were removed from the home, CSD again offered assistance in an effort to reintegrate the children into the home. Both parents continually refused to cooperate. In May, 1988, mother gave birth to J1, a boy. At that time, father had criminal charges pending against him as a result of the abuse of A. He was ordered to have no contact with children as a condition of his release.[2] Mother told CSD that she was separated from father in order to prevent CSD from taking the baby from the home. CSD discovered that mother and father were still living together and had moved J1 to a friend's house 100 miles away. CSD had received reports that the friend had engaged in sexual misconduct with a foster child who had previously lived with her. Because of their concerns about the friend, CSD removed J1.

In September, 1989, mother gave birth to another son, J2. At that time there were no court orders preventing father from contact with the children. Nevertheless, the CSD caseworker was concerned about the parents' fitness because of their persistent denial of the abuse and father's role in it and their unwillingness to pursue any treatment or steps towards reintegration of the children. The caseworker testified that father had threatened her. Because CSD felt there

---

[1] In this case, we refer to the children by their initials only. On our own motion we have changed the caption of the case to delete the children's full names.

[2] Those charges later resulted in a mistrial and are not given any weight in our review.

was a risk to the baby, J2 was removed from the home when he was three days old.

In January, 1990, the state filed petitions for termination of the parental rights of both mother and father to all four children. The proceedings were stayed pending appeal of the court's jurisdiction over the children. That appeal was dismissed on the parents' own motion.

In February, 1991, mother gave birth to a daughter, E. The court ordered mother and father to turn her over to CSD for custody by February 21. On February 20, mother and father moved to Idaho, taking E with them.[3] They made no attempts to visit or contact their four children in Oregon for nearly a year, until just before trial.

The state filed amended petitions for termination in April, 1991. After several delays, a trial was held on January 28, 1992. On March 4, 1992, the court terminated both parents' rights to A, T, J1 and J2.

Parents argue that the state's entire case rests on the "unsubstantiated claim" that father sexually abused A and that that claim is not enough to support the terminations. Parents are wrong. Most of the allegations arose as a result of the sexual abuse, but that is only one of the grounds upon which the state sought termination. The state presented six other grounds, four of which are independent grounds supporting termination under ORS 419.523.[4]

---

[3] The parents' rights regarding E are not involved in this appeal.

[4] ORS 419.523 provides, in part:

"(1) The parental rights of the parents of a child within the jurisdiction of the juvenile court * * * may be terminated as provided in this section and ORS 419.525 if it is in the best interest of the child.

"* * * * *

"(3) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"* * * * *

"(b) Conduct toward *any* child of an abusive or sexual nature.

The state alleged that parents were unfit because of mother's addictive, chronic or habitual use of intoxicating liquors or controlled substances; both parents' physical and emotional neglect of the children; lack of effort by both parents to adjust their circumstances, conduct or conditions to make return of the children possible despite the reasonable efforts of social agencies over an extended period of time; and failure of either parent to provide care or to pay a reasonable portion of care and maintenance of the children while they were in the custody of others. ORS 419.523(3)(c), (d), and (e); ORS 419.523(4)(a). All of those allegations are addressed to conduct other than the abuse itself.

The evidence is clear and convincing that both mother and father are unfit by reason of conduct and conditions seriously detrimental to the children. First, we find, by clear and convincing evidence, that father sexually abused A, and that the abuse was a repeated course of conduct. The physical evidence shows that A was sexually abused. She was examined by Dr. Halpert a few days after she initially reported the abuse. He found multiple scarring consistent with recurrent episodes, including a hymenal tear, rounding and heaping up of the edges of the hymen, and extensive trauma. He concluded that A had been repeatedly abused. Those findings were confirmed by Dr. Clark in July, 1988, who examined A at parents' request. Both doctors testified that the injuries could not have been caused by self-manipulation.

---

"(c) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(d) Physical neglect of the child.

"(e) Lack of effort of the parent to adjust the circumstances of the parent, conduct or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(4) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child for six months prior to the filing of a petition. In determining such failure or neglect, the court shall consider but is not limited to one or more of the following:

"(a) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others." (Emphasis supplied.)

On appeal, parents admit that the physical evidence shows that the abuse occurred. They claim that they did not deny that it happened but disagreed with the identification of the abuser. At trial, however, they went to great lengths to try to show that the wounds could be self-inflicted, even in the face of the evidence of their own medical expert.

The evidence is equally clear and convincing that it was father who abused the child. A's psychological tests and testimony reveal an intelligent girl who understands the difference between truth and lying. In the nearly four years between the day she first reported the abuse and the day of the termination trial, A went through extensive psychological testing and therapy during which she has repeatedly identified father as the abuser. Several caseworkers testified about pressure tactics by mother to influence the child and A's intense desire to return home. Even so, A wanted to return only as long as "daddy" did not hurt her anymore, and she continued to identify father as her abuser.

A CSD caseworker testified that A was specifically asked about several other people whom mother and father accused as potential perpetrators, and that A denied that they had ever touched her inappropriately. No evidence was presented indicating that they or anyone other than father had sufficient access to A to repeatedly abuse her.

We have held that abuse of one child by a parent may support termination of parental rights to other children. In *State ex rel Juv. Dept. v. Miglioretto*, 88 Or App 126, 744 P2d 298 (1987), the father's parental rights to his daughter were terminated based on his sexual abuse of his other daughter and his stepdaughter. We said:

> "ORS 419.523(2) does not require that any child remain in an abusive environment until the state can show that abuse of that particular child has occurred. If there is evidence of abuse of *any* child, the statute permits a court to remove a child permanently from a dangerous situation." (Emphasis in original.)

In this case, two doctors testified that A had been repeatedly abused. The evidence shows that the sexual abuse of A creates a harmful environment; and that mother has refused to confront it. Under the statute, this evidence of abuse of A

alone would be sufficient to support removal of the other children.

The evidence indicates that mother's priorities prevent her from focusing on her children's needs, including protecting them from harm. Mother testified that she left A with A's grandmother for a year and a half when A was approximately one year old. She said she did this because she wanted to pursue a lifestyle that included abuse of alcohol and drugs and she did not want to expose A to the "type of people" who were with her. A testified that mother told her that her new boyfriend did not like children. Mother's step-sister testified that, after mother reclaimed A, she took A to the coast to a party and, after a week had passed, concerned family members tracked them down and took A to the hospital because she appeared ill. Mother's step-brother testified that, at times, mother and her boyfriend would not have enough money for food, but they always had drugs.

There is no evidence of recent drug use by either father or mother. The trial court did not base the termination on drug or alcohol abuse, but it nevertheless found that these facts demonstrated mother's continuing attitude of putting her own interests ahead of her children. We agree with the trial court's assessment.

Even without that evidence, mother's relationship with father supports termination of her parental rights. In *State ex rel Juv. Dept. v. East*, 38 Or App 59, 589 P2d 744, *rev den* 286 Or 1 (1979), we terminated the mother's rights to her children based on her relationship with the father, who abused them. We found that her continued association with the abusive father was inconsistent with continuing her parental rights.

In this case, mother has continued to associate with father and this association is detrimental to the best interests of her children. Mother does not accept the possibility that A has correctly identified her abuser. A CSD caseworker testified that mother was uncooperative in A's treatment to the point that she had to be given written reminders not to try to influence the child in favor of father and not to promise A that she could come home soon. Other caseworkers testified that mother's demeanor and her interactions with A at supervised

visits have led A to blame herself for separating the family and causing their problems. Mother's best friend testified that mother never expressed concern that A had been hurt by the abuse, and the caseworker testified that mother refused to validate A's feelings or console her in any way for her pain.

In addition, mother refused to live apart from father even temporarily, although she faced having CSD take her newborn child, J1, because of the court order prohibiting father from contact with children. It is clear that mother's association with father is her primary concern, even in the face of contrary needs of her children. Those actions are inconsistent with her continued parental rights to her children. *State ex rel Juv. Dept. v. Darnell*, 49 Or App 561, 619 P2d 1349 (1980); *State ex rel Juv. Dept. v. East, supra.*

Both parents have refused to adjust their conduct to make the return of the children possible, despite the extensive efforts of CSD. ORS 419.523(3)(e). Although they have attended supervised visits, neither parent has taken any significant steps toward reintegration of the children into the home. CSD helped arrange counseling for both parents, but in the years since the children were removed, mother has attended only a few sessions. Father has made virtually no effort to get counseling and has never attended any of the recommended sessions, even though he was referred to several therapists who did not require him to admit to abuse in order to receive counseling. Although parent training courses were repeatedly made available, mother attended only one course, and went to just two of the eleven classes. Father did not attend any. The consistent attitude of both parents has been to deny that a problem exists and to blame CSD for their difficulties. They have been unwilling to cooperate with the efforts toward the return of their children. Especially significant is that parents did not try to visit or contact their children for nearly a year after they fled the state with E.

Finally, both parents failed to provide for the basic physical and psychological needs of A, T, and J1 for at least six months prior to the first filing of the petition for termination. ORS 419.523(4)(a). A, T, and J1 were in custody for more than six months before the first filing of the petition for termination. Neither parent has made any voluntary payments toward the substitute care of their children, although

they both had at least some income.[5] After receiving a bill for the substitute care, neither parent attempted to arrange payments or explain their alleged financial difficulties to the Support Enforcement Division.

It is clear from this record that reintegration of the children into the home is not probable in the foreseeable future because of conduct not likely to change, *State ex rel Juv. Dept. v. Pennington*, 104 Or App 194, 799 P2d 694 (1990), *rev den* 311 Or 166 (1991), and that it is in the children's best interest that the parental rights of both mother and father are terminated. ORS 419.523(1).

Affirmed.

---

[5] One payment was involuntarily made through the garnishment of a state tax refund; however, that amount was not significant in light of the expenses of foster care, treatment and medical expenses for the children.