Argued and submitted November 29, 1995; resubmitted In Banc June 12, reversed and remanded with instructions August 28, both petitions for review denied November 26, 1996 (324 Or 395)

In the Matter of Myrna Gohranson
and Paul Gohranson, Jr., Minor Children.

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY,
Myrna Gohranson and Paul Gohranson, Jr.,
*Appellants,*

*v.*

Paul GOHRANSON, SR.,
and Judy Gohranson,
*Respondents.*

(9301-80322; CA A88670)

923 P2d 1259

In Banc

Janie M. Burcart, Assistant Attorney General, argued the cause for appellant Juvenile Department of Multnomah County. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Kathryn Worden Underhill argued the cause for appellants Myrna Gohranson and Paul Gohranson, Jr. With her on the brief was Juvenile Rights Project, Inc.

Gary B. Bertoni argued the cause for respondent Paul Gohranson, Sr. With him on the brief was Saxon, Marquoit, Bertoni & Todd.

Peter Miller argued the cause and filed the brief for respondent Judy Gohranson.

DEITS, J.

De Muniz, J., concurring in part; dissenting in part.

## DEITS, J.

The state and children appeal the trial court's denial of the state's petition to terminate the parental rights of mother and father. The petition alleged that parents were unfit because, *inter alia*, "father was convicted of cruelty and endangering the health of a child * * * and by his history, he is at risk to sexually offend children," and mother "does not believe the father has sexually offended any child. She is unable to protect the children." We review *de novo* and reverse.

Father and mother have two children: Myrna, born in November 1990, and Paul, born in January 1992. Mother, who is 13 years older than father, was separated from her first husband when she and father began a sexual relationship in February 1990. They married in November 1990, about a month after her first marriage ended in divorce. Mother's four children from her first marriage lived with them at various times, both in California and, later, in Montana. Two of those children are Oliver III, born in November 1975, and Roby, born in April 1984. While living with mother and father in California, Oliver III was adjudicated as a juvenile for the sexual abuse of Roby.[1]

In the spring of 1992, mother and father were living in Butte, Montana, and Roby returned to California to live with her biological father. Roby reported to her father that, when she was living with mother and father in California, father had sexually abused her. On the basis of Roby's allegations, father was arrested on April 13, 1993, in Portland, where he and mother had moved with Paul and Myrna in the fall of 1992. In December 1993, father admitted to a Portland police detective that there had been three incidents of inappropriate touching involving Roby, all of which, according to him, were initiated by her. Father explained Roby's behavior as a result of Oliver's having molested her.

---

[1] The record shows that Oliver, himself, had been sexually abused by a family acquaintance.

Father was extradited to California to stand trial for the abuse of Roby, charged with one count of lewd and lascivious conduct against a child. Cal Penal Code § 288(a). After a preliminary hearing at which Roby testified, father was held to answer on two counts under § 288 of the California penal code. On September 8, 1993, he entered a no contest plea to the reduced charge of cruelty toward and endangering the health of a child. Cal Penal Code § 273(a)(1). He was sentenced to five years' probation, ordered to undergo psychological counseling, and prohibited from residing or working around minors without court permission. Father's probation will end in September 1998.

On January 28, 1993, because of Roby's allegations, CSD placed Myrna and Paul in foster care. The medical examination of Paul was normal except for some head bruises. Myrna, however, was very "fearful and resistive" when her genitals were examined, and the physical revealed an "abnormal" genital area. The child had almost no hymen. The only explanation that the doctor could give for that abnormality was chronic sexual penetration. In March 1994, the children were found to be within the jurisdiction of the juvenile court. The court found that Myrna had been sexually abused while in her parents' care.

In May 1994, seven months after husband's criminal conviction in California, mother decided to move from Portland to California to live with her parents while her children remained in the custody of CSD. Mother's parents live about two hours from where father was then living. The move was against the recommendations of CSD, which was concerned about mother's lack of visitation with the children while she was in California. Nonetheless, mother moved without finalizing arrangements with CSD for visitation or a transfer of the children to California. Mother claimed that the move was necessary because her landlord had raised the rent for her apartment. She also said that living with her parents would allow her to seek vocational training and counseling in preparation for the return of her children. The record shows, however, that mother's rent in Portland increased only $30.00 per month and that she did not adequately explore other options that would have allowed her to stay with her children. Apparently, she did check the YWCA shelter for

vacancy, but, upon finding it full, did not investigate any other sources of housing or funding for houses. Mother's landlord testified that he had agreed on numerous occasions in the past to accept whatever amount of rent that mother could afford and that he had never threatened her with eviction. He also stated that he would have extended her the same courtesies in the future.

While in California, mother did not contact CSD to request any visitation with her children until the day of the scheduled hearing. At that point, CSD had determined that further visits would be detrimental to the children. Consequently, it told mother that it would not allow visitation and that it had decided to seek termination of her parental rights.

The record also does not show any effort by mother, while in California, to pursue services designed to help her care for her children on an independent basis. There is no evidence that she participated in any social services, individual counseling, or vocational training. Further, there is no evidence of any support by her family in California. No one in her family offered letters of support for mother or indicated in any way that they would serve as custodial resources. In December, after mother had been in California long enough to meet residency requirements, she filed for divorce from father. The termination proceeding was held in April 1995. The trial court denied the petition for termination for both parents.

Appellants assign error to several rulings by the court that excluded evidence relating to father's treatment of Roby or his children.[2] We need not address those assignments, however, because we conclude that, even without the

---

[2] The court held irrelevant the testimony of a man who claimed to have had sexual intercourse with father when the man was a minor and excluded statements made by Roby to a physician because the statements did not qualify as ones made for the purpose of medical treatment or diagnosis. The court also excluded testimony of a therapist about statements made to her by Roby and by Leon, mother's son. Virtually all of the excluded evidence was cumulative or offered from another source and related to father's alleged abuse of the children. The possible exception is testimony that the state sought from a former staff member of a Montana shelter where mother went. The trial court held that that testimony was privileged. However, there was no offer of proof, and we do not agree with the state that the substance of the testimony that would have been given is nonetheless apparent. The error was not preserved. *See State v. Wright*, 323 Or 8, 14, 913 P2d 321 (1996); *State v. Olmstead*, 310 Or 455, 800 P2d 277 (1990).

challenged evidence, there is clear and convincing evidence that mother and father's parental rights should be terminated.

We first conclude that the state proved by clear and convincing evidence that father is unfit and that integration of the children into his home is unlikely in the foreseeable future. Under ORS 419B.504, the rights of a parent may be terminated "if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child," including "[c]onduct toward any child of [a] sexual nature."

■ Father first argues that his California conviction should not be considered evidence of inappropriate sexual conduct, because the basis for his California conviction is "unclear" and does not concern either of the children involved in this proceeding. We do not agree. The transcript from the preliminary hearing relating to that conviction shows that father sexually abused Roby on more than one occasion while the family was living together in California. We have clearly held that the conditions that a court may consider in termination proceedings under ORS 419B.504[3] authorize termination on a showing that abuse has occurred to *any* child. *State ex rel Juv. Dept. v. Miglioretto*, 88 Or App 126, 744 P2d 298 (1987). The statute does not require a child to remain in an abusive environment until the state can show abuse of that particular child. *Id.* at 129. *See State ex rel Juv. Dept. v. East*, 38 Or App 59, 70, 589 P2d 744, *rev den* 286 Or 1 (1979); *see also State ex rel Juv. Dept. v. Smith*, 316 Or 646, 853 P2d 282 (1993) (six-year-old male child was within jurisdiction of court upon showing, *inter alia*, that father had been convicted of sexually abusing the child's 12-year-old aunt in the home).

In addition to evidence that the parents' home was an abusive environment, there is also considerable evidence in the record that father actually was physically abusive to

---

[3] *Miglioretto* was decided under ORS 419.523(2), which was amended and renumbered ORS 419B.504 in 1993. The substance of the statute was not changed. We note that ORS 419B.502, enacted in 1993, authorizes termination of parental rights on proof "of a single or recurrent incident of extreme conduct toward the child or another child," including "sex abuse." The state did not rely on that statute.

Paul and Myrna. The children's older siblings testified that he routinely smothered the children with pillows and blankets when they cried. They also said that he reacted violently to Myrna's crying, once throwing her to the floor and causing her nose to bleed. The older siblings said that they often took action to protect the younger children from father. There is also overwhelming evidence that Myrna was sexually abused while in the care of mother and father. We conclude that the state has proven by clear and convincing evidence that father is unfit by reason of conduct or conditions that are seriously detrimental to the children.

■       We also conclude that the record here clearly and convincingly establishes that integration into father's home in the foreseeable future is highly unlikely. Father does not contend that he presently is a custodial resource, and, indeed, until September 1998, the conditions of his probation do not allow him to reside in a home where there is a child under the age of 18. He argues, however, that his parental rights should not be terminated because he intends "to have supervised visitation" with his children. He asserts that the children will be in mother's home and, therefore, they will be integrated into the home of a parent, as required by ORS 419B.504. Father's argument fails, however, because, as we will discuss, we conclude that mother's parental rights should also be terminated.

Moreover, the evidence does not show that father's conduct is likely to change in the foreseeable future. He argues that his cooperation with the social services that have been offered to him and with the conditions of his probation demonstrate his efforts to adjust his behavior to allow return of the children. We are not persuaded. We do not find that the record demonstrates significant progress towards that adjustment. In July 1994, Dr. Rozynko, a clinical psychologist specializing in sex offenders, performed an evaluation of father. He recommended specific behavioral treatment. He found that father has difficulties with excessive anger, impulse control and possible violence. He expressed the opinion that father "will likely have difficulty in recognizing his problems and dealing with them in psychotherapy." The state is correct that the record is "meager" at best as to what treatment, if any, father has obtained subsequent to that

evaluation. Father appears to have been involved with some individual counseling, but there is no evidence that any counseling has assisted father in controlling his anger or in resolving tendencies to molest children.[4] Further, he continues to deny any sexual offenses. The state proved by clear and convincing evidence that father is unfit and that integration of the children into father's home is unlikely in the foreseeable future. The trial court erred in denying the petition to terminate father's parental rights.

■    We turn to the question of the termination of mother's parental rights. The state sought to terminate mother's parental rights under ORS 419B.504,[5] alleging, *inter alia,* that she is presently incapable of protecting her children from physical and sexual abuse and that she is unable or unwilling to effect a lasting adjustment to her behavior so as to protect the children in the foreseeable future. *See State ex rel Juv. Dept. v. Ricks,* 118 Or App 566, 848 P2d 630 (1993); *State ex rel Juv. Dept. v. DeVore,* 108 Or App 426, 816 P2d 647 (1991);

The record is clear that three of mother's children have been subject to severe sexual abuse while in her care. For example, Dr. Thomas, the physician who examined two-year-old Myrna testified that she had almost no hymen. He has examined over 2,000 children for possible sexual abuse, yet, he stated that, "I've never seen a child this young with an examination with that little hymen, and that large of an

---

[4] Father states that CSD never made any efforts to assist him in changing his behavior. We do not conclude that "reasonable efforts," ORS 419B.504(5), required CSD to pursue services for father in California, particularly in the light of the basis for father's conviction and the conditions of his probation.

[5] ORS 419B.504 provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"* * * * *

"(5) Lack of effort of the parent to adjust to the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

opening." He testified that it was his opinion that the injury to her hymen was caused by chronic repeated sexual penetration. He estimated that Myrna had been sexually penetrated between 20 and 100 times.[6]

During the time period that Myrna was abused, mother was the primary caretaker of both Myrna and Paul. Yet, she completely denies that the children displayed any unusual behaviors or signs of abuse. This is in stark contrast to the description of the children given by the foster mother, with whom they were placed after being removed from mother's home.

The foster mother testified that she immediately observed very troubling behavior. She said that Myrna masturbates and that when she plays with her dolls she always pulls down their underpants. She also stated that both children were very fearful when they first came under her care. She said that Myrna had an extreme fear of being diapered. Myrna would "uncontrollably cry and squeeze her legs together." Both children would wake up numerous times during the night with nightmares. The foster mother described finding Myrna several times on the floor partially under the bed struggling in her sleep to get away from some invisible foe. Both children were afraid of running water. If Paul heard any sounds of running water, he would start crying and shaking and shivering. Both were also fearful of loud voices. Myrna would freeze when she heard loud voices, and Paul would start shaking and shivering. The foster mother said that the children were "in constant need of knowing if there's food there." Apparently, mother and father kept locks on the cupboards and refrigerator to keep food costs down.[7]

---

[6] The dissent seems to take us to task for detailing the nature and extent of the abuse that occurred to the children in this case. It takes the position that this is inappropriate because our focus should not be on the past, but rather on the future capability of mother to adjust her behavior. However, in assessing a parent's ability to change, the nature of and seriousness of the deficiencies as a parent are pertinent to determining the probability of the parent making necessary adjustments. For example, the seriousness and frequency of the sexual abuse of Myrna that occurred while mother was handling her daily care is certainly relevant to her extreme deficiencies as a parent.

[7] The dissent criticizes us for noting that the parents kept the cupboards locked to keep food cost down. The dissent implies that we are being unfair because that infers that the parents were depriving the children of food and, in its view, the only fair inference is that the family is poor. However, considered together with the

At trial, when mother was asked if the infants had any fears when they were living with her, mother responded "no," volunteering only that Paul did not like his baths. It is undisputed that mother was a caretaker of the children at the time that the abuse occurred and that she was told, at least by the older children, that physical abuse was occurring. Yet, at trial, mother denied that any abuse had occurred or that father was a possible abuser. In fact, she blamed her other children, including her six-year-old daughter, for the sexual abuse of the younger children. When asked at trial if she could have done anything to prevent the sexual abuse of Myrna, she answered no.

Mother's behavior with respect to the abuse of her daughter Roby also demonstrates mother's inability to protect her children. She was completely unable to recognize that her daughter, Roby, was being abused. At the very least, the circumstances should have alerted mother to possible abuse. One of her other children testified that mother was aware of physical abuse of the children by father. The child testified that mother was in the house on at least two occasions when the sexual abuse occurred. Other witnesses testified that Roby was very frightened of father. As noted above, the abuse of Roby was the basis of father's California criminal convictions. Yet, throughout these criminal proceedings, mother was completely supportive of father and angry at Roby.

■ No one contends that mother was the perpetrator of any of the abuse that occurred. That, of course, makes this case more difficult. We have held, however, that in the appropriate circumstances, a failure to protect a child is sufficient reason to terminate a person's parental rights. *Ricks*, 118 Or

---

other evidence in the record, it is not an unfair or unreasonable inference that the parents were not providing sufficient food for the children. The foster mother testified that the children were in constant need to know that there was food around. She stated:

"They would eat, and—eat a considerable amount of food, and still want more. And when the meal was over, they were just continuously asking for food.

"* * * * *

"We have a compost heap in our back yard, and if they did not get food * * * when they asked for it, they would—if they were playing out in the back yard, they would go and—and eat out of the compost pile."

App at 572-73; *DeVore*, 108 Or App at 432-33. The critical question in a case such as this is whether mother will be able to adjust her behavior so as to protect her children in the foreseeable future. After reviewing the evidence presented here, we are convinced that there is clear and convincing evidence that mother will not be able to adjust her behavior to protect her children in the future.[8]

One reason for reaching that conclusion is that mother has received adequate services to assist her in improving her parenting skills, but she has been unable to benefit from them. The record indicates that after CSD became involved in the case, mother received services ranging from individual counseling to group counseling that addressed domestic violence and child sexual abuse. Although mother did attend the classes and, according to her instructors, seemed to absorb the information, she has shown a consistent inability to apply that information to her own family. Riggs, mother's caseworker for CSD's permanent planning unit, indicated that mother was quite capable of echoing the information that she had been given, but has failed to adjust her underlying belief system. She testified:

"A [I]t's not about the services she was involved with, but more about her belief system, and there was no change in the time that I had the case, of her understanding, or appreciation of the abuse.

"Q Okay. So do you see that belief system changing, as the first step towards a lasting treatment program?

"A Well, certainly, she had—had the tools, and could parrot back how to protect children. But if she didn't believe * * * how could she protect? She didn't see [father] as a threat to the children."

Mother did receive some positive reports from the service providers. However, at least two of those reports were

---

[8] The general tenor of the dissent implies that we are terminating mother's parental rights simply because she is "uneducated, unsophisticated, and poor." 143 Or App at 54. Mother's general socio-economic condition arguably may have contributed to her deficiencies as a parent. However, our decision to terminate her parental rights is based, as it should be, on whether or not she will be able to protect her children from abuse in the future, not her income tax bracket or intelligence.

based on incorrect information provided by mother. Spohn, mother's caseworker at the YWCA, wrote, "[mother] is capable of protecting her children from abuse, and is highly motivated to do so." However, that same letter indicates that Spohn was laboring under two serious false impressions concerning mother's denial of father's involvement in her children's abuse. With respect to the allegations of abuse by Roby, Spohn wrote:

"She has many reasons to disbelieve Roby's accusations and to believe that they were instigated by her [natural father]. * * * *The charges of sexual abuse against [father] have now been dropped,* an event which would seem to corroborate what [mother] has said all along." (Emphasis supplied.)

With respect to the evidence of Myrna's sexual abuse, Spohn wrote:

"[T]hrough CSD, Myrna was examined for evidence of sexual abuse by a Dr. Hall, *whose findings indicated no evidence of abuse.* Yet, CSD still had the children. Myrna was again examined by a Dr. Thomas, and this time a strong possibility of abuse was found. It looks to [mother] like CSD wanted evidence of sexual abuse and kept having her daughter examined until they got it." (Emphasis supplied.)

When confronted at trial with the fact that mother had provided her false information, Spohn withdrew her support of mother:

"Q  What was your understanding of—of the charges against [father]?

"A  I had never heard the charges. I was basically going on what [mother] was saying.

"Q  And so [mother] was telling you that the charges had been dropped?

"A  Yes.

"Q  Would it change your opinion of her progress if you were to find out that he, in fact, was convicted of cruelty and endangerment of [Roby]?

"A  Yes.

"Q  How would it change your opinion of her progress?

"A If I knew that, that she was not seeing things the way they were.

"Q Would that change your opinion about the relative success of reuniting her children with her? Do you think she's more of a risk.

"A As a result of that misperception?

"Q M-hm.

"A Yes. Yes.

"* * * * *

"Q Would it change your opinion of her progress to know that the original doctor did find evidence of sexual abuse [of Myrna]?

"A Absolutely.

"Q All right. How would that change your opinion of her risk?

"A *Well, that she was not, perhaps, able to protect her children from abuse.*" (Emphasis supplied.)

LaFrance, the leader of mother's domestic violence group wrote a letter of support for mother on January 12, 1994, in which she stated, "When discussing her children [mother] is able to express her frustration with the [child welfare system] without blaming her children." However, when LaFrance was confronted with conflicting evidence at trial, she also tempered her support of mother:

"Q It was your recollection that that [statement] had to do with [Roby] who had indicated she was abused by [father]?

"A Yes.

"* * * * *

"Q Would you find it concerning that in a psychological evaluation in May of 1994, she blamed [Roby] for lying, and retaliating, in making these accusations? Would you find that concerning?

"A Of course.

"Q Okay. Would you find it concerning that she took the same position in March of this year, in a subsequent

psychological evaluation, that she blamed this child for making retaliatory accusations?

"A   Yes."

Probably the most troubling aspect of mother's circumstances is that despite the information available to her, and despite the programs offered to her, even as late as the time of trial, mother was in complete denial of the possibility that father had abused the children. In a letter in January 1994, Carnaghi, a social services specialist, states that, in July 1993, mother was actively participating in services but was "in denial about her children being abused and that [father] presented a threat of harm to her children." Individual counseling was recommended to determine whether mother "was able to internalize what she had learned." Mother enrolled in counseling at the YMCA. However, Carnaghi's report shows that, in January 1994, mother was still in denial in spite of father's conviction related to the sexual abuse of her daughter.

A psychological evaluation of mother in May 1994 by Dr. Volkin, a clinical psychologist, shows continuing denial. Volkin found that mother had a "pattern of dependent relationships with men," and stated that, despite "having been in various kinds of treatment aimed at enhancing her knowledge of offenders and molesting children[,]" and "[d]espite disclosure of molest[ation] by two of her children as well as incriminating medical findings from her younger children concerning [father's] treatment of her younger children, [mother] steadfastly maintains her view of him as having been wrongly accused." Mother explained that father's plea of no contest was made to an allegation of having placed Roby in an unsafe environment, not as to the allegation of sexual abuse. She also blamed Roby for lying about the molestation as a means to break up mother's relationship with father. Volkin stated that mother's plan to divorce father was "motivated solely by her wish to secure the return of her children, rather than by any concern as to [father's] risk of maltreating them."

No fundamental change in mother's denial is reflected in the evaluation of mother by Dr. Vien, a psychologist, which was made in March 1995, shortly before trial.

Although Vien found no severe psychopathology, he concluded that mother was passive, subservient and dependent in relationships. She remained equivocal regarding allegations that father sexually and physically abused her children, stated that she did not observe the abuse or any significant changes in her offspring. Her plan to protect her children was to "avoid future heterosexual relationships." Even at the termination hearing, mother continued to confirm her belief that father did not sexually abuse her children and that he was not a risk to them.[9]

Mother relies on the fact that she has filed for a divorce from father as evidence that she is making adjustments in her behavior. However, again based on the evidence presented, we are not persuaded. First, there is some question whether mother really does intend to sever her relationship with father. As Dr. Volkin stated, it was her view that mother's sole motivation in divorcing father was her wish to secure the return of her children and not any concern about the risk father poses toward the children. Mother, herself, testified that concern for her children was not her motivation for divorcing father; rather it was because their relationship had deteriorated.

Mother's actions also belie her intent to separate herself from father. Although her stated reason for moving to California was financial difficulties and the desire to obtain the support of her family who was there, the fact is that the move put her closer to where father was and further away from her children. Mother acknowledges that she has had contact with father in California. Mother left the state against the recommendation of CSD and without waiting for California's agreement to accept her children for services. When she left, she told CSD that she would visit the children twice a month. However, she did not do so and did not contact

---

[9] The dissent concludes that it does "not find that mother remains implacable" in her denial of the sexual abuse of her children. It asserts that when the evidence is viewed in its entirety "mother has progressed in 'internalizing' what she has learned about sexual abuse." 143 Or App at 57. Yet, the dissent is unable to point to any evidence that shows that mother has applied, in any way, the information that she has learned to her own life. The evidence does show that mother has remained implacable in her denial of any abuse problem with respect to her children. As noted above, as late as the hearing on this matter, she completely denied that father had abused the children or posed any risk to them.

CSD or the children until the day of the hearing regarding the children. Even assuming that mother has severed her relationship with father, as recognized by the experts who evaluated mother, she has shown a pattern of dependent relationships and there is a strong possibility that she will again involve herself in an abusive relationship. If that occurs, based on her past record, it is likely that her children will again be at risk. We conclude that, based on the evidence presented, mother's complete inability to recognize her children's need for protection and her failure to take any action to protect them from harm makes it highly improbable that the children can be returned to her in the foreseeable future.

We conclude that there is clear and convincing evidence that both mother and father are unfit parents by reason of conduct or condition seriously detrimental to the children and that integration of the children into the home of mother or father in the foreseeable future is improbable because of the conduct and conditions that are not likely to change. As the Supreme Court stated in *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 189, 796 P2d 1193 (1990):

> "In a termination case * * * the issue is not whether a parent should be 'punished' by a termination of his or her parental rights * * *. Children have a right to grow up in a wholesome and healthful environment, free from fear of abuse, injury, or neglect. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time so as to provide such an environment, the best interest of the child(ren) generally will require termination of that parent's parental rights."

It has been shown by clear and convincing evidence that mother and father are unwilling or unable to adjust themselves so as to provide these children with a wholesome and healthful environment and that they have been given a reasonable time to do so. It is in the best interests of the children here that both mother and father's parental rights be terminated now. The trial court erred in denying the petition to terminate mother's parental rights.

Reversed and remanded with instructions to enter judgment terminating the parental rights of father and mother.

**DE MUNIZ, J.,** concurring in part; dissenting in part.

I agree with the majority that father's parental rights should be terminated. However, the state did not prove that mother abused or neglected her children, and it did not prove that she is returning to a relationship with father. On my review of the record, I cannot agree with the majority that the state proved that mother is unable or unwilling to change so as to make the return of her children improbable. Accordingly, I dissent from the majority's conclusion that mother's rights should be terminated.

The majority acknowledges that the proper inquiry is whether mother can protect her children in the foreseeable future. 143 Or App at 46-47. However, it ignores that that determination must be made by clear and convincing evidence that mother is unable or unwilling to change after being offered reasonable social services "for such extended duration of time that it appears reasonable that no lasting adjustment can be effected." ORS 419B.504(5). Rather, the majority relies in large part on events that occurred before services were offered. The majority blames mother for the abuse of Roby when mother "was in the house on at least two occasions when the sexual abuse occurred." 143 Or App at 46. It provides details of Myrna's physical examination,[1] concluding that, "[d]uring the time period that Myrna was abused, mother was the primary caretaker of both Myrna and Paul. Yet, she completely denies that the children displayed any unusual behaviors or signs of abuse." 143 Or App at 45. The majority continues, contrasting mother's lack of awareness with the foster mother's details of the children's responses.[2]

---

[1] That detail can only be meant to bolster the majority's decision to terminate mother's parental rights. It suffices to say that the abuse occurred, because there has never been any dispute about Myrna's sexual abuse and never any suggestion that mother was the perpetrator of that abuse. It should also be made clear that the record does not prove that father was the perpetrator of the abuse of Myrna.

[2] The majority also notes that the foster mother said that the children were in constant need of knowing that food was available because, "[a]pparently, mother and father kept locks on the cupboards and refrigerator to keep food costs down." 143 Or App at 45. The inference is that the parents deprived the children of food. However, it is abundantly evident that this family was poor. The locked cupboards show only that the family's poverty affected the amount of available food.

Implicit in that discussion and comparison is that mother is responsible for permitting the sexual abuse. However, the standard against which we must measure mother's progress is her ability to change *after* being offered reasonable social services. I find nothing in this record that shows that, until Roby's allegations precipitated the intervention of CSD in Portland, mother was ever offered any services that might have heightened her awareness to sexually abusive environments or that could have helped her to recognize signs of such abuse and to intervene to prevent it. What the record does show is that the degree of knowledge about sexual abuse that the majority assumes mother should have had is not likely to have existed, given her lack of education and sophistication and her poverty.

Being uneducated, unsophisticated and poor does not excuse mother's behavior, but it does provide the basis from which we assess her ability to change. Unlike the majority, I conclude that the record does show that mother has benefitted from the services offered and is likely to continue to do so. After CSD removed the children from their parents' care in January 1993, mother participated in all the services required of her. Gorrin, the CSD caseworker who received the case in January, testified that, at the time he made his six-month narrative, mother was in full compliance with the service plan. Mother had attended CSD's nonoffending parents group, had completed a psychological evaluation, was in CSD-approved parent-training classes, maintained regular and consistent visitation with the children, cooperated with CSD home visits, maintained contact with her CSD worker, kept CSD informed of her whereabouts and provided requested releases.

Mother received positive reports from the service providers. She was reliable in her attendance at the six-week parent-training course in which, among other things, the class addressed general issues around offenders in the home, such as anger cycles, risk factors, and detecting sexual abuse. Mother impressed the group leader by her ability to work through her fears and become more assertive. She was respectful, active in the group and demonstrated skill in doing behavior management exercises and in understanding

child development information. Mother regularly attended a support group for domestic violence for six or seven months. The leader found that mother participated well, was responsive to and supportive of others in the group, and appeared to benefit and learn from the group. The leader found that mother "displays a huge amount of commitment and love toward her children and has worked diligently to regain custody of them."

The majority brushes aside the positive reports that mother received because "at least two of those reports were based on incorrect information provided by mother." 143 Or App at 47. It finds that Spohn was "laboring under two serious false impressions," *id.*—that the charges of sexual abuse had been dropped and Dr. Hull did not find evidence of abuse. Yet the sexual abuse charges against father were dropped: He pled no contest to a charge of cruelty and endangering the health of a child. There is nothing in the record to indicate that mother had any understanding of the nuances of reduced charges through plea negotiations. Also, Dr. Hull's assessment was "suspected" child abuse, and he referred Myrna for further evaluation.

The majority also places much importance on mother's return to California. It implies that the reason was to be with father and that mother's stated reasons—financial difficulties and family support—were specious, and that mother did not make sufficient efforts to try to avoid a move. However, I cannot agree that the evidence shows that mother was devious or that her move from Portland indicates that she was unwilling to make efforts to remain near her children. The trial court found that mother had "valid reasons" for the move, and I agree with that finding. Mother had never lived in Portland until shortly before CSD intervened. Despite the majority's contention otherwise, the record does show that mother had family support in California.[3] Furthermore, although her rent increased "only $30.00," 143 Or App

---

[3] There is a December 1993 letter, apparently to CSD or the court, from mother's father. It concludes:

"We couldn't be more pleased than to receive a phone call from Judy saying; 'Hey Dad—come to Portland and bring me and the kids home.'

"I would be in Portland the very next day."

at 40, that is not an insignificant amount for a person, such as mother, employable at minimum-level wage jobs.[4] Furthermore, I do not read mother's landlord's testimony of accepting, in the past, "whatever amount of rent that mother could afford," as meaning that she could ignore the increase in rent. The accommodation that he made was not requiring her to pay all the amount at once. He testified that "[s]he did pay all that she owed." Also, before moving in April 1994, mother wrote to the court, providing a California address and information as to the reasons for her move. Her caseworker acknowledged that she had discussed the move with him. When in California, mother contacted CSD in May to tell them that she had been ill, and she let them know that she was with family.[5]

The majority also finds it significant that, in California, mother did not show any efforts "to pursue services designed to help her care for her children on an independent basis." 143 Or App at 41. However, it is not clear to me what mother could have done in the three months between her move in April 1994 and CSD's decision to staff the case for termination in early July 1994, when CSD made no move to act on her request for an Interstate Compact. In fact, what the record does show is that CSD moved for termination instead of requesting an Interstate Compact, even though the psychological evaluation of mother, done by Volkin and provided to CSD in May 1994, recommended that "the children be moved to a foster home in the state of California where they can be near their mother and have regular visitation with her there." Riggs, the caseworker, testified:

"Q   Why did you disagree with Dr. Volkin's recommendation [for Interstate Compact] back in May of 1994?

"A   Well, when I—when I received the report, I reviewed it, and to be real frank, I—I didn't—I thought it was a mistake. I thought the recommendations—They were so inconsistent with the body of the report, I thought there was an error.

---

[4] At the time of trial, mother was working at Burger King.

[5] The record also contains a copy of a June 1994 letter sent by mother to the caseworker to be read to the children.

"The whole—My reading of the report, it was instance after instance of [mother] not believing, and blaming the children. And yet, the recommendations are inconsistent with that. That's why I didn't follow through with all Mrs.— Or Dr. Volkin's recommendations."

As does the majority, I find troubling mother's denial of father's sexual abuse. However, unlike the majority, I do not find that mother remains implacable in that denial. When the reports are considered in their entirety, and in the light of the other evidence, I find that mother has progressed in "internalizing" what she has learned about sexual abuse.

That mother would initially refuse to admit any possibility of father's abuse is not an unusual response. Gorrin testified that he had removed children in other instances where there was an allegation of sexual abuse on the part of one parent and that the other parent did not "generally" accept the information "at first blush." The May 1994 report from Volkin does show that mother still did not acknowledge that father was an abuser, but it also shows that mother was gaining an awareness of sexual abuse. Volkin reported that mother recognized that "clues to offender tendencies include being too nice as well as too prone to isolation and controlling behaviors." The March 1995 pretrial report of Dr. Vien, a psychologist, states that mother remains "equivocal" about father's abuse but that mother "was able to verbalize general and specific behavioral signs in abuse victims, demonstrating a level of retention from her prior treatment."

Furthermore, even though mother did not acknowledge father's abuse, neither Volkin nor Vien concluded that mother could not be reunited with her children. Volkin stated that "[i]t is difficult to reach definitive conclusions regarding [mother's] capacity to be protective of her children," but, if mother maintained her separation from father, Volkin recommended "that a plan be developed for reuniting her" with the children. Vien concluded:

"[Mother's] evaluation results suggest that she is capable of gradually resuming care of her children with adequate environmental support. She seems genuinely committed to her offspring and will likely cooperate with court and social service recommendations. Her geographic proximity to her

family in California also enhances her parenting capacity. *Therefore, it is concluded with reasonable clinical certainty that [mother] is and will remain for the foreseeable future, capable of adequately parenting her children."* (Emphasis supplied.)

We have upheld the termination of parental rights for a parent's failure to protect a child from sexual abuse. In *State ex rel Juv. Dept. v. DeVore*, 108 Or App 426, 816 P2d 647 (1991), the mother's rights were terminated when she repeatedly allowed her daughter to be alone with people who she knew had abused her daughter and when she continued to associate with people who were harmful to her daughter. Likewise, in *State ex rel Juv. Dept. v. Ricks*, 118 Or App 566, 848 P2d 630 (1993), the mother's rights were terminated when she continued to associate with the father, who had sexually abused the child, and lied to CSD about separating from him.

In those cases, the mothers remained in abusive environments. Here, the state did not present any evidence that mother is in such an environment. The state presented no evidence to rebut mother's evidence that she was divorcing father. It presented no evidence to rebut the evidence that, even if mother's original reason for the divorce was to "put the children first," the couple has subsequently grown apart. In other words, unlike in *DeVore* and *Ricks*, there was no evidence that mother would be returning the children to an abusive environment, and, in fact, Vien's report regarding mother's proximity to her family shows the contrary.

My *de novo* review of the record, transcripts and exhibits does not convince me by clear and convincing evidence that mother has failed to adjust her conduct after reasonable efforts by available social agencies for such an extended duration of time that no lasting adjustment can be effected. The trial court, which had the opportunity to assess mother's demeanor, refused to terminate mother's parental rights. I concur with that determination.

Haselton, J., joins in this dissent.